ATTORNEYS FOR APPELLANT
Stephen T. Owens
Public Defender of Indiana

Joanna Green
Steven H. Schutte
Kathleen Cleary
Deputy Public Defenders
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Stephen R. Creason
Chief Counsel

Kelly A. Miklos
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

FILED
Apr 04 2013, 12:16 pm
CLERK
of the supreme court,
court of appeals and
tax court

No. 10S00-1004-PD-185

DANIEL RAY WILKES                                      *Appellant (Petitioner),*

v.

STATE OF INDIANA                                       *Appellee (Respondent).*

Appeal from the Clark Circuit Court, No. 10C01-1009-PC-612
The Honorable Carl D. Heldt, Special Judge

**April 4, 2013**

**Dickson, Chief Justice.**

The defendant, Daniel Ray Wilkes, has appealed the post-conviction court's denial of his claim that he was deprived of his constitutional rights to an impartial jury and effective assistance of counsel. We affirm the post-conviction court.

The defendant was convicted by a jury of the 2006 murders of Donna Claspell and her two daughters, eight-year-old Sydne Claspell and thirteen-year-old Avery Pike.[1] The State

---

[1] A detailed recitation of the facts is available in our opinion on the defendant's direct appeal. Wilkes v. State, 917 N.E.2d 675, 679 (Ind. 2009). Because the defendant's post-conviction claims relate to various stages of the trial process, additional facts will be provided specific to each issue, as necessary.

sought the death penalty and, in the penalty phase of the trial, the jury found all four charged statutory aggravating circumstances and that the aggravating circumstances outweighed the mitigating circumstances but reached no agreement on a sentencing recommendation. In accordance with statute, Ind. Code § 35-50-2-9(f), the trial court then conducted the sentencing, independently found that the aggravating circumstances outweighed the mitigating circumstances, and sentenced the defendant to death. The defendant appealed, and we affirmed. Wilkes v. State, 917 N.E.2d 675 (Ind. 2009).

The defendant then petitioned for post-conviction relief on various grounds. The post-conviction court denied relief on all but one of the defendant's claims, modifying the defendant's sentence from death to life imprisonment without the possibility of parole.[2] While succeeding in obtaining relief from his death sentence, the defendant now appeals from the denial of his additional post-conviction request for new trial, claiming (a) that his trial counsel were constitutionally ineffective for failing to fully investigate and present certain exculpatory evidence; (b) that his trial counsel were constitutionally ineffective for failing to question a specific juror ("Juror A") during *voir dire*; (c) that his trial counsel were constitutionally ineffective for inadequately preserving for appeal the defendant's objection to the trial court's time limitation on *voir dire* thereby depriving the defendant of an impartial jury; (d) that, by declining to fully answer two questions on the juror questionnaire, Juror A committed misconduct and deprived the defendant of his right to an impartial jury; and (e) that the post-conviction court erred in denying the defendant's motion for discovery or *in camera* review of materials relating to Juror A's family.

---

[2] At the penalty phase of the defendant's trial, the jury was unable to reach a unanimous sentencing recommendation. The trial court, as required by statute, Ind. Code § 35-50-2-9(f), then conducted the penalty phase anew. Taking note of the then-controlling case law, the trial court, in sentencing the defendant, refused to consider the jury's inability to reach a consensus as a mitigating circumstance. On direct appeal, this Court affirmed the trial court's reasoning and found no reversible error, Wilkes, 917 N.E.2d at 692–93, but concluded that legislative changes to the death penalty statute, subsequent to the case law relied upon by the trial court, rendered "the fact that the jury—whose recommendation would otherwise be binding—could not agree" a circumstance that "the trial court should be permitted to consider in determining the appropriate sentence." *Id.* at 693. The defendant, in petitioning for post-conviction relief, contended that this change in the law should be applied to his case. The post-conviction court consisted of the same trial judge that presided over the defendant's murder trial. In denying the defendant's other claims, the post-conviction court modified the defendant's sentence, concluding: "[The] ruling of the trial court, had it been permitted to consider the jury's indecision, would have been different. It would have been for life imprisonment without parole." Findings of Fact, Conclusions of Law and Judgment, Appellant's App'x at 551–52. The State has not appealed the sentence modification and asks only that this Court affirm the post-conviction court.

Post-conviction proceedings are civil proceedings in which the defendant must establish his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); Ben-Yisrayl v. State, 738 N.E.2d 253, 258 (Ind. 2000). Post-conviction proceedings do not offer a super-appeal, "[r]ather, subsequent collateral challenges to convictions must be based on grounds enumerated in the post-conviction rules." Stevens v. State, 770 N.E.2d 739, 746 (Ind. 2002) (citing P.-C.R. 1(1)); Ben-Yisrayl, 738 N.E.2d at 258. Those grounds are limited to "issues that were not known at the time of the original trial or that were not available on direct appeal." Ben-Yisrayl, 738 N.E.2d at 258. "Issues available but not raised on direct appeal are waived, while issues litigated adversely to the defendant are *res judicata*." Pruitt v. State, 903 N.E.2d 899, 905 (Ind. 2009) (citing Allen v. State, 749 N.E.2d 1158, 1163 (Ind. 2001)); *see also* Ben-Yisrayl, 738 N.E.2d at 258. Claims of ineffective assistance of counsel and juror misconduct may be proper grounds for post-conviction proceedings. *See* Pruitt, 903 N.E.2d at 906; Allen, 749 N.E.2d at 1164, 1166; Ben-Yisrayl, 738 N.E.2d at 259.

Because the defendant is appealing from the denial of post-conviction relief, he is appealing from a negative judgment and bears the burden of proof. Ben-Yisrayl, 738 N.E.2d at 258. Thus, the defendant "must establish that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision." *Id.* "In other words, the defendant must convince this Court that there is *no* way within the law that the court below could have reached the decision it did." Stevens, 770 N.E.2d at 745. We review the post-conviction court's factual findings for clear error, but do not defer to its conclusions of law. *Id.* at 746 (citing Ind. Trial Rule 52(A)).

### 1. Assistance of Trial Counsel

The defendant contends that his trial counsel were constitutionally ineffective in violation of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 13, of the Indiana Constitution in three ways: (a) that trial counsel did not fully investigate and present evidence that "casts doubt" on the State's theory during the guilt phase of his trial, Appellant's Br. at 6; (b) that trial counsel permitted an "unqualified [death penalty] juror" to

3

be empanelled by not asking that juror any questions other than the written questionnaire, *id.* at 23; and (c) that trial counsel failed to adequately preserve any objection to the trial court's imposition of time limits on *voir dire*, *id.*

Claims of ineffective assistance of counsel are evaluated using the Strickland standard articulated by the U.S. Supreme Court. Ward v. State, 969 N.E.2d 46, 51 (Ind. 2012); Ben-Yisrayl, 738 N.E.2d at 260. To establish ineffective assistance of counsel, a defendant must demonstrate to the post-conviction court (1) that counsel performed deficiently based upon prevailing professional norms ("reasonableness") and (2) that the deficiency resulted in prejudice to the defendant ("prejudice"). Ward, 969 N.E.2d at 51 (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984)).

This standard first asks whether, "considering all the circumstances," counsel's actions were "reasonable[] under prevailing professional norms." Strickland, 466 U.S. at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694; *see also* Pruitt, 903 N.E.2d at 906 (quoting Lambert v. State, 743 N.E.2d 719, 730 (Ind. 2001) ("Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference." (alteration omitted)). Second, even if counsel's performance is deficient, the defendant must demonstrate that counsel's deficient performance actually prejudiced the defense. Ben-Yisrayl, 738 N.E.2d at 260. That is, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Further, counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." Kubsch v. State, 934 N.E.2d 1138, 1147 (Ind. 2010) (citing Ben-Yisrayl v. State, 729 N.E.2d 102, 106 (Ind. 2000)).

A. *Investigating and Presenting Allegedly Exculpatory Evidence*

The defendant contends that his trial counsel rendered constitutionally ineffective assis-

tance by failing to fully investigate and present certain evidence of an exculpatory nature, namely: (1) testimony of two neighbors of the victims that each claimed to have seen at least one of the victims after the State's proposed timeframe for commission of the crimes by the defendant; (2) cell phones recovered in the victims' home containing call histories that purportedly conflict with the State's proposed timeframe for commission of the crimes by the defendant; and (3) a "potential alternative suspect," Appellant's Br. at 10, who was encountered by two neighbors and the police in the vicinity of the victims' home the day before the victims were discovered.

The Strickland ineffective assistance of counsel standard "require[s] no special amplification in order to define counsel's duty to investigate." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695. Furthermore, on appeal in post-conviction proceedings, the defendant must demonstrate that the evidence points unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. Ben-Yisrayl, 738 N.E.2d at 258.

The State's theory during the guilt phase of the defendant's trial was that the defendant committed the murders during the night or early-morning hours of Sunday, April 23, through Monday, April 24, 2006. The victims' bodies were not discovered until Wednesday, April 26, 2006. Witnesses testified that the defendant stayed in the victims' home Sunday night the 23rd but left the home at approximately 8 a.m. Monday morning the 24th. The defendant's whereabouts between leaving the victims' home on Monday morning the 24th and the time of his arrest on Wednesday the 26th were readily accounted for. Certain other facts adduced at trial supported the State's theory: (1) the defendant's confessions to the crimes corroborated the State's proposed timeline; (2) the girls, Avery and Sydne, had not been to school Monday, Tuesday, or Wednesday (24th–26th) and the victims' family had not seen or heard from them those days; and (3) the medical examiner that performed the autopsies estimated the time of death to be the early-morning hours of April 24.

The post-conviction court entered specific findings of fact and conclusions of law on each of the defendant's claims. With respect to the defendant's contention that his trial counsel were constitutionally ineffective for failing to investigate and present available exculpatory evidence at trial, the post-conviction court found that the defendant's claim failed both the reasona-

5

bleness and prejudice prongs of the Strickland standard. The post-conviction court concluded that it was a reasonable trial strategy to forgo presentation of the evidence because it was "unreliable and inconsistent with [the defendant's] trial theory." Findings of Fact, Conclusions of Law and Judgment, Appellant's App'x at 511–12. Additionally, the post-conviction court found that the "evidence of [the defendant's] guilt is overwhelming" and, even had the defendant's counsel presented the additional evidence, "the result of [the defendant's] trial would have been the same." Id. at 512. The record supports the post-conviction court's conclusions.

On his appeal from the denial of requested post-conviction relief, the defendant contends that his counsel should have presented the testimony of Matthew Reed and of Marian Wade, each of whom was a neighbor of the victims. During the death investigation, Reed's wife briefly spoke with police and informed them that Reed had seen one of the victims, Sydne, playing outside on Monday, April 24. This information was noted in a police report containing notes on brief interviews with eight different individuals in the victims' neighborhood on Wednesday, April 26, the day the victims were found. Wade approached investigators on Thursday, April 27, and gave a recorded statement in which she stated that she encountered Donna and Avery outside their home on Monday afternoon, April 24. Wade further stated that Donna was engaged in a verbal disagreement with an adult male which involved yelling and vulgar language but that she did not see the individual with whom Donna was arguing. The police report of interview notes and a transcription of Wade's statement were provided to the defense team.

At the post-conviction hearing, Reed testified that he saw Sydne in the back yard of the victims' home, which abutted Reed's "side yard," on Monday, April 24, 2006. P.-C. Tr. at 130, 132.[3] He stated that he knew it was a Monday because "it was the first day of the workweek" and he saw Sydne when he "took [his] dogs out," as was his custom, before leaving for work shortly before 2 p.m. Id. at 130, 133. When asked whether it may have been the previous Monday, Reed stated, "No, it was definitely that week." Id. at 133. Reed also stated that no representative from the defendant's trial team ever contacted him. Wade testified that she encountered Donna and Avery on Monday, April 24, 2006, and described the verbal altercation with an adult

---

[3] Throughout this opinion, the transcript of the post-conviction hearing will be cited as "P.-C. Tr." and exhibits from the post-conviction hearing will be cited as "P.-C. Ex." The transcript of the defendant's trial, both guilt and penalty phases, will be cited as "Trial Tr."

male as she had in her previous statement. She stated that she knew it was "a Monday" because she was returning from the liquor store (which was closed on Sundays), her daughter had just got out of school, and her boyfriend, who worked Monday through Friday, was at work. *Id.* at 123, 125. However, in direct contradiction of her previous statement to police, Wade testified that she saw the individual with whom Donna was arguing and that the individual was the defendant.

The defendant also contends that cell phones recovered by police from the victims' home contained evidence that his trial counsel should have presented. Three cell phones were found in the victims' home. The phones were taken by investigators and logged as evidence, but neither side utilized them at trial. On post-conviction review, the phones were analyzed, revealing the phone numbers associated with two of the phones (a Motorola and a Nokia) as well as some call history on the Motorola phone.[4] The call history on the Motorola phone showed a call placed at 6:50 a.m. on Tuesday, April 25, 2006, to the home phone of Mike Baker. The caller-ID device in Baker's home shows no record of such a call. However, Baker's caller-ID does show a call from the Nokia phone on Monday, April 24, 2006, at 6:42 a.m. Additionally, the Vanderburgh Sheriff's investigator that analyzed the phones testified that the date/time stamp on the cell phones may have been incorrect. He stated that he could not verify that the call history of the cell phones was correct without the call records from the cell network carrier because the phones may have required manual entry of the date and time by the user when the phone was initially programmed. That is, if the initial user entered an incorrect date or time, the discrepancy would be reflected in the call history stored by the phone.

The defendant further argues that testimony regarding the presence of a third party, Glen Spradley, in the vicinity of the victims' home should have been presented to the jury. The post-conviction record reveals that Spradley was briefly in a drug rehabilitation facility with the defendant, Baker, and one of the victims (Donna). The record further reveals that on Tuesday, April 25, 2006, Spradley was seen near the victims' home. Charles Thornton, who lived across the street from the victims, encountered Spradley entering Thornton's home through the front door. When Thornton confronted him, Spradley said he was "looking for Dan" and departed when Thornton informed him that he had the wrong house. P.-C. Ex. 4, at 124. Another neigh-

---

[4] The investigators were unable to extract any information from the third phone.

bor also encountered Spradley trespassing through his yard, again "looking for Daniel." P.-C. Tr. at 203–04. The neighbor testified that Spradley appeared to have "been drinking or on drugs or something." *Id.* at 204. Spradley left when informed that he had the wrong house. The neighbor, however, called the police. An Evansville police officer responded to the call and found Spradley changing a flat tire on his vehicle near the victims' home. Spradley informed the officer that "he was looking for some friends he knew from rehab." P.-C. Ex. 13, at 196. The officer also found Spradley to be "under the influence of something," *id.*, and helped Spradley arrange for someone to pick him up. The officer stood "within feet" of Spradley but did not see any blood on his clothing. P.-C. Tr. at 162–63.

The defendant's trial defense team also testified at the post-conviction hearing. The lead-counsel, Barbara Williams, had over twenty-five years experience as an Indiana attorney including "close to 150 felony jury trials," *id.* at 42, and multiple capital cases as both lead and co-counsel. Both Williams and her co-counsel, Kurt Schnepper, were qualified capital case attorneys in accordance with Criminal Rule 24. *See* Ind. Crim. Rule 24(B). Bill Denton served as the trial defense team's guilt-phase investigator. Denton had over nine years experience as an investigator for the Vanderburgh County Public Defender and had approximately thirty years experience as a deputy sheriff in Vanderburgh County.

Investigator Denton testified that he reviewed all of the discovery information provided by the State in preparation for the trial on his own and with the defendant's counsel. Denton recognized Thornton's report to the police and was sure he followed-up "in some fashion" but did not recall a conversation with Thornton (regarding Spradley). P.-C. Tr. at 14. Nor did Denton recall specific conversations with Reed or Wade but did remember speaking to witnesses regarding the timeline of the crimes, individuals "that lived in the neighborhood . . . that thought they saw the victims." *Id.* at 28–29. Denton also remembered seeing photographs of the phones from the victims' home and was sure that the defense team visited the evidence storage facility to review the physical evidence but could not recall a specific time or discussion with an evidence technician, nor could he recall turning on the phones. Denton further testified that he investigated leads of his own initiative and at the request of counsel and that there was "excellent communication" among the defense team. *Id.* at 28.

8

With respect to the investigation and presentation of evidence, attorney Williams testified that the defense theory of the case was that Mike Baker committed the murders and that reliable evidence that challenged the State's theory of the case would have been presented. Williams also testified that the defense "was a very cohesive team and we met very, very, very frequently and we discussed . . . every aspect . . . of the case." *Id.* at 60. Williams was not questioned regarding Reed, Wade, Spradley, or the cell phones. Attorney Schnepper testified that he reviewed every piece of evidence regarding Mike Baker in preparation for cross-examining Baker during the trial. Schnepper remembered reviewing the photographs of Baker's caller-ID readouts to establish "a time line as to who called and when they called" Baker's house. *Id.* at 84. Schnepper also remembered that cell phones were recovered from the victims' home but could not recall whether information was retrieved from the phones. However, he testified that if there was helpful information on the phones, the defense team would have utilized that evidence. Schnepper also stated that the defense theory was that Mike Baker was the murderer, *id.* at 93, and that the defense team investigators and consultants "did a fabulous job," *id.* at 98.

The record of the defendant's trial overwhelmingly demonstrates that the defense team's theory of the case was that the defendant's confessions were unreliable and Mike Baker was the perpetrator of the crimes. Counsel elucidated this theory in opening statements and in closing arguments. Counsel thoroughly cross-examined Baker about his relationship with the victims and his potential motive for committing murder. Furthermore, counsel expended significant effort cross-examining the investigating officers about their investigation of Baker, contending that the police too readily dismissed Baker's alleged involvement based upon the defendant's initial confession; a confession which the defense argued was unreliable. This was a reasonable strategy given Baker's admitted adulterous-romantic interest in one of the victims, Donna; his admitted visits to the victims' home to get high on methamphetamine; his admitted role as the supplier of methamphetamine to Donna and the defendant; his admitted role in helping his son, who was then facing felony drug charges, manufacture the methamphetamine; and the defendant's allegation, during interrogation, that Baker was the culprit.

While the testimonies of Wade and Reed and the timestamp on the Nokia cell phone sug-

9

gest that the victims were alive after the defendant left the victims' home, presentation of this evidence would have required an entirely different defense strategy focusing on the possibility of an unknown assailant. In seeking post-conviction relief, the defendant presents Spradley as that potential unknown. Thus, this new strategy would have hinged upon the coincidental appearance of Spradley, the singular sighting of one of the victims by Reed, a potentially inaccurate cell phone timestamp, and the inconsistent statements of Wade. Even when viewed cumulatively, this evidence is relatively weak in comparison to the strategy actually employed by the defense. *See* Kubsch, 934 N.E.2d at 1154 (quoting Reaves v. State, 586 N.E.2d 847, 858 (Ind. 1992)) ("Alleged '[t]rial irregularities which standing alone do not amount to error do not gain the stature of reversible error when taken together.'").

The defense strategy, implicating Baker for the murders, included acceptance of the State's timeline for commission of the crimes. During the initial interrogation, the defendant told police that Baker committed the murders on Sunday night or Monday morning and that Baker threatened the defendant not to tell anyone.[5] This defense strategy not only aimed direct suspicion at Baker but also provided a reason for the defendant's confessions (fear of Baker), confes-

---

[5] The transcription of the defendant's interrogation by Detectives Ron Brown and Ken Taylor contains the following exchange:

> Q. Are you afraid of Mike and Mike did it. And you're afraid of Mike telling on him [sic] because you're afraid that he will hurt you? Tell me the truth now, did Mike do this? Did you see Mike hurt her, did you see Mike take that level and hurt Donna?
>
> A. He called me in there, and said look.
>
> . . . .
>
> Q. He said look and what did you see?
>
> A. Seen Donna lying there.
>
> . . . .
>
> Q. [Mike] told you that he did it?
>
> A. He said because she was going to tell his wife and they were in to it and he was drinking.
>
> Q. What did you do it [sic] when you saw her?
>
> A. Said I was going to call the Police.
>
> Q. What did he do?
>
> A. He said, I'll do that to you.

State's Trial Ex. 102 at 55–56.

10

sions which the defense sought to undermine as unreliable or false. If the defense chose to present evidence of a conflicting timeline, the defense could not contend that the defendant's implication of Baker was truthful. Such a strategy would have nullified the defense's attempt to implicate Baker and, more importantly, would have severely hindered the argument that the defendant's confessions were unreliable. That the defense strategy was ultimately unsuccessful does not mean that counsel was constitutionally ineffective. *See* Strickland, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694 ("Judicial scrutiny of counsel's performance must be highly deferential."); *see also* Pruitt, 903 N.E.2d at 906 (quoting Lambert, 743 N.E.2d at 730 ("Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference." (alteration omitted))). "The purpose [of the effective assistance guarantee of the Sixth Amendment] is simply to ensure that criminal defendants receive a fair trial." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694. The defendant failed to demonstrate to the post-conviction court that his counsel's selection of trial strategy was unreasonable "under prevailing professional norms." *Id.* at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694. And he has clearly failed to establish in this appeal that the evidence conclusively points to a conclusion contrary to that reached by the post-conviction court.

Additionally, even if counsel's performance had been constitutionally deficient so as to satisfy the first prong of the Strickland test, the second prong was not met, that is, "that there is a reasonable probability that . . . the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. The post-conviction court found:

> The evidence of [the defendant's] guilt is overwhelming, including eye witness accounts placing him at the scene both before and after the commission of the murders, DNA evidence placing the blood and/or biological material of his victims on various pieces of clothing that [the defendant] was seen wearing the day of or the day before the murders, and his four statements regarding his commission of the murders and his molestation of Avery. Specifically, in his voluntary statements to police, [the defendant] supplied several key facts about the crime that were not responses to police-suggestion and that showed his deliberate actions in murdering his victims.

Findings of Fact, Conclusions of Law and Judgment, Appellant's App'x at 512. The record supports the post-conviction court's conclusion that had the evidence from Reed and Wade, the cell phones, and Spradley's presence been introduced the result of the defendant's trial would have been the same. On appeal, the evidence does not compel a contrary conclusion. We decline to

11

reverse the denial of post-conviction relief on this claim.

## B. Conducting Jury Selection

The defendant contends that his trial counsel were ineffective because they "failed to ask Juror A any questions" during *voir dire*.[6] Appellant's Br. at 23. The post-conviction court denied relief on this issue. Finding that the defendant did not establish to the post-conviction court that his legal representation was constitutionally ineffective, we conclude that the denial of relief was proper.

The defendant's argument focuses on Juror A's refusal to answer portions of two questions on the jury questionnaire. The questionnaire was 21 pages in length, consisting of 112 questions, many of which requested further explanation if a particular answer to a yes-or-no question was given. Juror A declined to answer a question that related to drug abuse and, after marking the yes-or-no portion, declined to explain the answer to a question regarding counseling for substance abuse or mental, emotional, or psychological problems. Juror A fully answered the other 110 questions. After the penalty phase of the defendant's trial, the jury was unable to reach a unanimous sentencing recommendation. The trial court sentenced the defendant to death. On post-conviction review, testimony revealed that the jury's vote during the penalty phase of the defendant's trial was 11 votes for life imprisonment without parole and 1 vote for death. The solitary vote for a sentence of death was Juror A.

The principal focus of the defendant's argument with respect to Juror A is that his trial counsel were constitutionally ineffective for failing to inquire into Juror A's ability to consider and weigh the defendant's mitigation evidence during the penalty phase of the trial. The majority of the defendant's mitigation evidence related to his upbringing and the effects of substance abuse and mental health issues on the defendant and his family. The defendant contends that Juror A's refusal to fully answer the two questions regarding substance abuse and counseling should have alerted counsel to the possibility that Juror A would not be receptive to the defend-

---

[6] By agreement of the parties the juror was not named in the post-conviction proceeding and will be referred to only as "Juror A."

ant's mitigation evidence.

The defendant's counsel did not question Juror A during *voir dire*. The State, however, did question Juror A, and Juror A's answers were apparently satisfactory to both parties. Neither party moved to strike Juror A for cause. As discussed above in Part 1(A), defense attorney Williams had over twenty-five years experience as an Indiana attorney including "close to 150 felony jury trials" and multiple capital cases as both lead and co-counsel. P.-C. Tr. at 42. And defense co-counsel Schnepper had approximately five years experience as a criminal attorney. Both Williams and Schnepper were qualified capital case attorneys in accordance with Criminal Rule 24. *See* Ind. Crim. Rule 24(B). In addition to trial counsel's experience and training in empanelling death penalty juries, trial counsel employed a jury consultant, Heather Pruss, who reviewed every juror questionnaire and provided the defense team with feedback. The defense investigators, Bill Denton and Steven Brock, also reviewed the questionnaires and the team collectively evaluated the jury pool before and during *voir dire*.

At the outset, the defense team sought to identify "people that are always going to vote death," P.-C. Tr. at 118 (testimony of Consultant Pruss), and "whether or not there are people on the jury who will consider mitigation," *id.* at 50 (testimony of Attorney Williams). Attorney Schnepper noted that more than one questionnaire had "blank spots" or affirmative declinations to answer and that the team "just generally took those into consideration. . . . [D]epend[ing] on what the question was." *Id.* at 79–80. The defense team viewed a prospective juror's contact with addiction or mental illness as a possible negative where a spouse and children were involved, preferring instead experience with "a brother or a sister or a distant family member or someone like that, where [the juror] would be more understanding of the disease." *Id.* at 81. However, the defense team generally viewed a prospective juror's "close contact with drug addiction or alcoholism or something of that nature" as a positive because such a juror was more likely to be sympathetic to the defendant's mitigation evidence. *Id.* at 80.

Even with the omitted answers, Juror A's questionnaire clearly indicated close contact with substance and physical abuse and mental illness, each from different individuals—a former spouse, a mother, a sister, and a grandfather. Juror A's questionnaire answers also revealed sup-

13

port for the view that social factors and the particular details of a crime are each relevant to determining punishment. Juror A's answers further indicated receptiveness to testimony by mental health doctors and professionals. Additionally, Juror A expressed strong concern about the finality of the death penalty.

Because of the time limitation on *voir dire*, the defense team relied wholly on the questionnaires in evaluating some prospective jurors, choosing instead to use the allotted *voir dire* time to direct questions to those prospective jurors with questionnaire answers or responses to questions by the State that revealed the most potential prejudice to the defendant's trial or mitigation strategy. This was done in an effort to have those potentially prejudicial jurors struck for cause.[7] Furthermore, because of the extensive jury questionnaires, trial counsel were in the best position to evaluate the jury pool as a whole, knowing what potentially prejudicial jurors were on the panel with Juror A as well as those that would be on future panels. The defense team could have reasonably viewed Juror A positively based solely upon Juror A's questionnaire and answers to the State's questions—particularly considering Juror A's expressly stated unease about the finality of the death penalty and Juror A's contacts with substance abuse and mental illness— and thus made a tactical decision to focus on other prospective jurors during the selection process. Such a decision is well within the discretion of trial counsel. *See* Pruitt, 903 N.E.2d at 906 (quoting Lambert, 743 N.E.2d at 730 ("Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference." (alteration omitted))).

In addition to his penalty phase arguments with respect to Juror A, the defendant also briefly asserts that his defense counsel's failure to question the juror was harmful during the guilt phase of the trial. During the defendant's trial, counsel sought to undermine the defendant's confessions by highlighting the defendant's initial claim during interrogation that he had no "memory of any of the events other than flashes of the scene," Appellant's Br. at 16, and by argu-

---

[7] Before the post-conviction court, Attorney Schnepper stated,

> I know there were—there were times where we would get stuck on a particular juror that we— that either I or [Attorney Williams] thought that we really had cornered—almost cornered to get them struck for cause and we would have to spend time specifically on that juror and we may not have gotten to all of the people in the panel during that allotted time, so yes.

P.-C. Tr. at 81.

14

ing that the initial confession was the result of coercive interrogation. This strategy was partially based upon the defendant's admission to ingesting alcohol, methamphetamine, and a prescription anxiety medication the night of the murders and his claim during the initial interrogation that he was still under the influence of drugs. The defendant now contends that a juror, such as Juror A, "who had an ex-spouse who became violent while drinking is likely not to be receptive to the defense theory at guilt phase." *Id.* However, Juror A was candid about this topic in the jury questionnaire and trial counsel was thus aware of Juror A's experience without further questioning.

With respect to the impact of Juror A on both the guilt and penalty phases, the assessment of Juror A's ostensible biases as compared to the other prospective jurors on the *voir dire* panel and in the jury pool as a whole was a matter properly within the tactical discretion of trial counsel, and the record does not demonstrate that counsel was constitutionally ineffective in the exercise of that discretion. The defendant has failed to establish to the post-conviction court that his trial counsel were constitutionally ineffective for using *voir dire* to question other jurors instead of questioning Juror A during the time allotted. The defendant is not entitled to relief on this claim.

*C. Establishing Record for Appeal*

The defendant further argues that trial counsel "failed to make an adequate record for appealing the time limit placed on jury selection." *Id.* at 23. The trial court's time limit was thirty minutes per panel for each party.[8] Trial counsel made a general objection to the time limitation imposed by the trial court, which was overruled, and had previously voiced this objection during pretrial conferences. *See* Trial Tr. at 368. We understand the defendant's argument to be that trial counsel failed to make an individual request for more time to question Juror A, or the juror's panel.

With respect to this claim, the post-conviction court correctly noted that "[a] trial court has broad discretionary power to regulate the form and substance of voir dire," Findings of Fact,

_____

[8] There were a total of eight panels each consisting of nine to twelve prospective jurors.

15

Conclusions of Law and Judgment, Appellant's App'x at 510; *accord* <u>Ward v. State</u>, 903 N.E.2d 946, 955 (Ind. 2009), and concluded that the defendant suffered no prejudice, thus failing to satisfy the second prong of the <u>Strickland</u> constitutional ineffective assistance of counsel standard. As previously discussed, trial counsel were willing to forgo questioning Juror A in order to question other jurors on the panel. This was a tactical decision within trial counsel's discretion. Regardless, even if trial counsel had specifically objected and requested additional time to question Juror A, the trial court would not have been required to grant the additional time. The trial court did not abuse its discretion in limiting *voir dire* to thirty minutes per panel for each party, nor do we think that it would have been an abuse of discretion had the trial court refused to extend the time with respect to any individual panel, including that of Juror A. *See, e.g.*, <u>Lucas v. State</u>, 499 N.E.2d 1090, 1093–94 (Ind. 1986) (upholding conviction for multiple counts of burglary where trial court imposed thirty-five minute time limit for each side on jury selection which was shared by *joint defendants*); <u>Zachary v. State</u>, 469 N.E.2d 744, 747 (Ind. 1984) (upholding convictions for rape and criminal deviate conduct where trial court imposed twenty minute time limit for each side on jury selection which was shared by *joint defendants*); <u>Wickliffe v. State</u>, 424 N.E.2d 1007, 1008 (Ind. 1981) (upholding murder conviction where trial court imposed twenty minute time limit for each side on jury selection); <u>Lynn v. State</u>, 271 Ind. 297, 298–99, 392 N.E.2d 449, 450–451 (1979) (upholding murder conviction where trial court imposed twenty minute time limit for each side on jury selection); *see also* <u>Addison v. State</u>, 962 N.E.2d 1202, 1206 (Ind. 2012) (noting trial court's "normal time limit of thirty minutes per side" for jury selection in murder trial). Even if we hypothesize that the defendant's trial counsel were deficient in failing to request additional time to question Juror A, such omission did not result in the requisite prejudice under <u>Strickland</u> and thus the defendant is not entitled to prevail on this claim.

With respect to each of the defendant's claims of constitutionally ineffective assistance of counsel raised on appeal, the evidence, as a whole, does not lead unmistakably and unerringly to a conclusion opposite that reached by the post-conviction court. The judgment of the post-conviction court is affirmed.

## 2.  Fair and Impartial Jury

The defendant's appeal also challenges the post-conviction court's rejection of his claim that his constitutional right to an impartial jury was violated because, had Juror A fully answered the jury questionnaire or been further questioned regarding the omitted answers, "a challenge [for cause] to Juror A would have been sustained." Appellant's Br. at 19. The defendant makes his claim under both the U.S. Constitution and the Indiana Constitution. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."); Ind. Const. art. 1, § 13(a) ("In all criminal prosecutions, the accused shall have the right to a public trial, by an impartial jury, in the county in which the offense shall have been committed[.]"); *see also* Taylor v. Louisiana, 419 U.S. 522, 526, 95 S. Ct. 692, 696, 42 L. Ed. 2d 690, 696 (1975) ("[T]he Sixth Amendment's provision for jury trial is made binding on the States by virtue of the Fourteenth Amendment."). The post-conviction court found that the record did not sustain the defendant's claim and denied relief. After reviewing the record, we affirm the post-conviction court's holding.

In such claims of juror misconduct under the Indiana Constitution, "to warrant a new trial, there must be a showing that the misconduct was gross, and that it probably harmed the defendant." Lopez v. State, 527 N.E.2d 1119, 1130 (Ind. 1988). First, the defendant contends that Juror A committed gross misconduct by, as discussed above in Part 1(B), failing to fully answer two questions on the jury questionnaire. Second, the defendant argues that had counsel or the trial court inquired into Juror A's failure to fully answer one of the questions, that Juror A would have affirmatively refused to answer even if instructed to do so by the trial court. This, the defendant claims, would have led to the dismissal of Juror A for cause.

While Juror A should have answered the questions fully, McFarland v. State, 271 Ind. 105, 110, 390 N.E.2d 989, 992 (1979) ("It is the duty of each juror to answer all questions on voir dire fully and truthfully."), we do not think that Juror A's actions here rose to the level of gross misconduct. *Compare* State v. Dye, 784 N.E.2d 469, 474–75 (Ind. 2003) (finding gross misconduct in murder trial that involved allegations of rape where juror hid the fact that her brother had been convicted of murder and received a death sentence and the fact that she had been a victim of rape and that she recalled and compared her experience during the trial), *with*

17

Warner v. State, 773 N.E.2d 239, 246–47 (Ind. 2002) (finding no gross misconduct in murder trial where juror unintentionally omitted the fact that her sister had been murdered and juror testified that the incident did not affect her impartiality). There is no evidence that Juror A was at all untruthful, and the manner in which Juror A declined to answer revealed, rather than concealed, that Juror A had some experience with family members' substance abuse and mental health issues. Nor does the record demonstrate that Juror A lacked impartiality. The defendant points to specific statements made by Juror A when deposed for purposes of this post-conviction proceeding and contends that Juror A was biased against the defendant's mitigation evidence. However, Juror A's deposition, as a whole, reveals that Juror A properly understood the process of weighing the aggravators and mitigators in the deliberation process and does not show that Juror A refused to consider the defendant's evidence. Rather, the defendant's dispute concerns the *weight* that Juror A gave to the defendant's mitigation evidence. That Juror A did not weigh the aggravators and mitigators in the manner the defendant would have liked does not show that Juror A was biased. The actions of Juror A in failing to fully answer two questions on the pretrial questionnaire do not establish gross misconduct in this case. Absent a showing of gross misconduct, the issue of resulting prejudice is irrelevant. The record does not conclusively demonstrate any error by the post-conviction court on this issue.

To prevail before the post-conviction court under the federal standard, it was the defendant's burden to "'first demonstrate that a juror failed to answer honestly a material question . . . and then further show that a correct response would have provided a valid basis for a challenge for cause.'" Dye, 784 N.E.2d at 472 (alteration in original) (quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556, 104 S. Ct. 845, 850, 78 L. Ed. 2d 663, 671 (1984)). Denying this claim, the post-conviction court found "the record contains no support for the proposition that 'Juror A' was attempting to hide anything relevant to his jury service or to mislead counsel or the court." Findings of Fact, Conclusions of Law and Judgment, Appellant's App'x at 548. More importantly, however, the post-conviction court expressly found that the evidence presented failed to establish that Juror A "would have been excludable for cause or that trial counsel would have reasonably used a peremptory strike to remove him at voir dire." *Id.* On appeal, the defendant has not presented compelling evidence undermining the post-conviction court's determination on this issue.

18

### 3. Discovery and *In Camera* Review

The defendant finally contends that the post-conviction court erred in denying his motion for discovery or *in camera* review of confidential mental health records pertaining to certain members of Juror A's family. Post-conviction proceedings are governed by the same rules "applicable in civil proceedings including pre-trial and discovery procedures." P-C.R. 1(5). Trial and post-conviction courts are accorded broad discretion in ruling on discovery matters and we will affirm their determinations absent a showing of clear error and resulting prejudice. State v. McManus, 868 N.E.2d 778, 790 (Ind. 2007).

The post-conviction court's ruling, the defendant argues, "deprived [him] of his ability to develop necessary facts in support of his claim that [Juror A] was not impartial and should have been stricken for cause." Appellant's Br. at 20. However, the defendant did discover the circumstances surrounding the confidential mental health records and was able to discuss the matter with Juror A during the deposition. Thus, what the defendant sought with this motion was more detail and in matters of a very private concern. We think such detail carries relatively little weight in comparison to the privacy interests of Juror A and Juror A's family. *See* Dye, 784 N.E.2d at 477 ("The State also argues that the post-conviction court's decision 'will open the floodgates to numerous juror investigations after sound verdicts have been rendered' and warns that the corollary response of the State will be 'to conduct extensive pre-trial investigations of the venire to protect convictions and sentences.' We agree that these consequences are extremely undesirable. This is so not only because of the societal interest in the finality of criminal proceedings but also because of our interest in assuring the safety and personal privacy of citizens who serve as jurors. Post-trial investigations of jurors should be the exception, not the rule."). Through other available means, the defendant was able to develop a record of Juror A's experiences relating to Juror A's omitted answers on the questionnaire. The defendant has failed to demonstrate that the post-conviction court's refusal to allow the defendant to comb through the private and confidential mental health records of Juror A's family was clearly erroneous.

### Conclusion

The post-conviction court granted the defendant's request to vacate his death sentence. In thus imposing a sentence of life imprisonment without parole, the court denied the defendant's request for a reversal of his convictions and remand for a new trial based on claims that the defendant received constitutionally ineffective assistance of trial defense counsel; that the defendant was deprived of his right to an impartial jury under the U.S. and Indiana constitutions; and that the defendant was entitled to discovery or *in camera* review of the mental health records of Juror A's family. In his appeal from this latter denial of post-conviction relief, the defendant has not met his burden to obtain appellate relief. He has not established that the post-conviction evidence conclusively points to a conclusion contrary to that of the post-conviction court. We affirm the judgment of the post-conviction court and the defendant's resulting sentence of life imprisonment without parole.

Rucker, David, Massa, and Rush, JJ., concur.