## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 26 2019, 7:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT *PRO SE*

Darren Englert
Carlisle, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Darren Englert,

*Appellant-Petitioner,*

*v.*

State of Indiana,

*Appellee-Respondent.*

August 26, 2019

Court of Appeals Case No. 18A-PC-3091

Appeal from the Tippecanoe Superior Court

The Hon. Randy J. Williams, Judge

Trial Court Cause No. 79D01-1411-PC-7

**Bradford, Judge.**

# Case Summary

[1] In June of 2011, Jeremy Gibson and Carolann Clear invited Darren Englert and Antonio Williams to move in with them. Within a week of moving in, Englert and Williams attacked, beat, hog-tied, and killed Gibson, one using a hatchet and the other using a pick axe. The State charged Englert with, *inter alia*, murder. Englert pled guilty to murder and was later convicted, after a jury trial, of several other crimes. The trial court sentenced Englert to an aggregate term of eighty years of incarceration. Englert's convictions and sentence were affirmed on direct appeal.

[2] In April of 2018, Englert filed an amended petition for post-conviction relief ("PCR"), alleging that his guilty plea to murder had not been knowing, voluntary, or intelligent and that he had received ineffective assistance of trial counsel. Following an evidentiary hearing, the post-conviction court denied Englert's PCR petition in full. As restated, Englert contends that the post-conviction court erred in failing to find that his guilty plea to murder had not been knowing, voluntary, or intelligent and that he had received ineffective assistance of trial counsel. Because we disagree, we affirm.

# Facts and Procedural History

[3] We related the underlying facts of this case in our disposition of Englert's direct appeal:

> Gibson and Carolann Clear began a romantic relationship in May 2011. Shortly thereafter, Clear and her mother, Joanne, moved into Gibson's one bedroom apartment in Lafayette. Gibson, the father of two young children that did not live with him, was

employed as a dishwasher at a local restaurant. Neither Clear nor her mother was employed. In June 2011, Gibson and Clear met Englert and Antonio Williams at a party. Both men were unemployed. Shortly thereafter, Gibson invited Englert and Williams to move into his apartment. The two men accepted Gibson's invitation and agreed to help Gibson pay for food and rent. Problems began immediately. Although Clear apparently still considered Gibson to be her boyfriend, she and Englert became involved in a sexual relationship, and Gibson asked Joanne to move out, which angered Clear.

At approximately 2:00 a.m. on July 6, 2011, less than a week after they moved into Gibson's apartment, Englert and Williams attacked Gibson in the kitchen when he returned home from work. Williams was apparently angry because he believed Gibson had "disrespected" Clear. Tr. p. 463. The two men hit Gibson with their fists and kicked him. Gibson, who was much smaller than his attackers, was unable to defend himself. After beating Gibson, Englert and Williams removed Gibson's clothing, hog-tied his wrists and ankles with a dog collar and belt, threw him in a cold shower, and left him there for ten to fifteen minutes to rinse off his blood.

While Gibson was in the shower, Englert, Williams, and Clear sat in the living room and discussed what to do with Gibson. Clear suggested killing him. Englert and Williams dragged Gibson out of the shower, untied him, and told him to get dressed. Gibson was in no condition to resist at that point, and Williams announced that they were all going for a ride in Joanne's roach-infested compact-sized car. Williams got into the driver's seat, and Gibson was placed in the front seat with a belt around his neck. Englert sat directly behind Gibson and restrained him with the belt. Clear sat next to Englert and taunted Gibson while performing oral sex on Englert.

Williams drove to an acquaintance's house and took a pick axe, a hatchet, a shovel, and a gas can out of the acquaintance's garage. Englert, Williams, and Clear discussed digging a six foot by six foot hole, beating Gibson, and burying him. Williams then drove

out to County Road 500 North in Tippecanoe County. During the drive, Gibson pleaded for his life. He told Englert and Williams that he didn't want to die because he had babies, and that they could have Clear and his SNAP food stamp benefits card.

At some point, Williams stopped the car on the county road, removed Gibson from the vehicle, and placed a plastic bag over his head. Clear removed the tools from the car, and Englert dug a shallow hole next to a corn field. Williams shoved Gibson into the hole, and Englert handed Williams the pick axe. Both Williams and Englert beat Gibson with the tools until he was dead and then removed his bloody clothing. They left the belt around Gibson's neck. Because the hole Englert dug wasn't deep enough to bury Gibson, Englert and Williams put Gibson in a fetal position and covered his body with dirt and corn stalks from a nearby cornfield. Englert and Williams discussed burning Gibson's body, but Clear told them that the nearby trees would catch fire.

Immediately after leaving the scene, Englert, Williams, and Clear drove to a bridge and threw the shovel, pick axe, and hatchet into the Wabash River. They threw Gibson's shoes into a dumpster, and returned to Gibson's apartment to clean up the bloody kitchen. They hid the bloody clothes that Gibson was wearing when he died under the stove. About 7:00 a.m., Englert and Clear used Gibson's SNAP card to purchase soda and snacks at the Village Pantry. Clear telephoned the restaurant that employed Gibson and asked for his paycheck.

Later that day, Englert and Williams drove Joanne's car to an Ace Hardware store where Williams stole a large bag of mulch and a bottle of hydrochloric acid. The two men returned to Gibson's gravesite and poured acid on Gibson to destroy evidence. They also covered Gibson's body with the mulch. The men left the mulch bag and acid bottle in Joanne's car. When they returned to Gibson's apartment, Joanne cleaned out her car and threw the mulch bag and acid bottle in the front yard.

That night, Clear told a friend that Englert and Williams had killed Gibson. The friend called the Lafayette Police Department and reported that Gibson was missing. Lafayette Police Department Officer Shana Wainscort responded to the call at approximately 1:00 a.m. on July 7 and spoke with Clear's friend, who took the officer to Gibson's apartment. Officer Wainscort observed the mulch bag and acid bottle in the front yard. She and Officer Jacob Daubenmeir knocked on the front door, and Joanne invited them in to look around the apartment. The officers noticed Gibson's wallet on the living room floor and asked Joanne to contact Clear. Shortly thereafter, the officers noticed Clear, Williams, and Englert walking down the middle of the street towards the apartment. Although initially cooperative, they all became agitated and aggressive when questioned about Gibson. They eventually refused to answer additional questions and returned to Gibson's apartment. As the officers continued their investigation in the front yard, Englert and Williams came out of the apartment and taunted the officers about failing to arrest them. Later that morning, Officer Daubenmeir arrested Englert for minor consumption of alcohol. Marijuana was found in Englert's wallet. When questioned at the police station, Englert gave several false statements as to where Gibson might be. When asked about the cuts and other injuries to his hands, arm, and neck, Englert became agitated and said he injured himself while peeling potatoes.

Officers at Gibson's apartment found Gibson's blood in the shower and on the kitchen floor. The dog collar used to hog-tie Gibson was found on the bathroom floor between the toilet and the shower. Gibson's blood was also found on the rubber seal on the trunk of Joanne's car. Officers were eventually able to locate Gibson's burial site with Williams' help. The officers found a blood-stained plastic bag at the side of Gibson's grave. As the officers slowly excavated the burial site by removing the corn stalks, mulch, and dirt, their eyes began to burn from the hydrochloric acid. Williams also directed the officers to the

Wabash River where they recovered the pick axe, shovel, and hatchet.

[….]

The evidence at trial revealed that Gibson sustained injuries consistent with both a hatchet and the pick side of a pick axe. His body also showed a pour pattern from the hydrochloric acid. Specifically, the injuries consistent with the hatchet were a five-inch laceration to the left side of his neck that severed his carotid artery and jugular vein, and a five-inch laceration to the right side of his head and neck that cut through his ear, fractured his cervical vertebra, and severed his spinal cord. The wound to the spinal cord was fatal. The injuries consistent with the pick side of the pick axe were circular wounds that fractured his jaw, knocked out his teeth, entered his brain, and entered the belt that had been cinched around his neck and pushed it into his neck. Gibson also sustained a laceration to his upper lip and bruises on the top of his head, his left ankle, and right thigh.

*Englert v. State*, No. 79A04-1302-CR-88, slip. op. at *1-3 (October 17, 2013), *trans. denied*.

[4]    On July 13, 2011, attorneys Earl McCoy and Chad Montgomery appeared on behalf of Englert, with McCoy as lead counsel. On July 19, 2011, the State charged Englert with murder and Class A felony conspiracy to commit murder. On August 26, 2011, the State added charges of Class B felony conspiracy to commit criminal confinement, Class B felony criminal confinement, Class C felony conspiracy to commit battery, Class C felony battery, Class D felony conspiracy to commit fraud, two counts of Class D felony fraud, and Class A misdemeanor possession of marijuana. Englert's defense team eventually learned through numerous conversations with prosecuting attorneys that the State was considering filing a request for the death penalty or life without parole

("LWOP"). McCoy recalled that he and Montgomery also came to believe that is was likely that Englert would be found guilty of Gibson's murder.

[5] Although Englert had originally been uninterested in the possibility of pleading guilty, his opinion changed as the case progressed. McCoy and Montgomery discussed possible options with Englert, including an open plea to the murder charge in which Englert would admit to participation in the murder of Gibson as an accomplice but deny a direct role in inflicting Gibson's death. McCoy's plan was to remove the possibility of the death penalty or LWOP from the case by a preemptive plea to the murder charge. Moreover, while McCoy had received no promises or assurances from the State about the result of an open plea to murder, McCoy hoped that the State would be satisfied with a murder conviction and dismiss the remaining charges. If the State reacted in that way, McCoy thought, Englert's guilty plea would count as a significant mitigating fact at sentencing.

[6] Englert discussed this idea with his counsel on multiple occasions. Englert eventually decided to accept McCoy's idea and was "absolutely on board with that plan." PCR Tr. Vol. II p. 13. McCoy's plan was to enter the plea suddenly at a routine hearing in order to give the State no time to file a request for the death penalty or LWOP. At a pretrial hearing on March 14, 2012, McCoy again confirmed with Englert that he wanted to plead guilty to the murder charge. McCoy approached the trial court and informed it that Englert wanted to plead guilty to the murder charge. When the prosecutor objected on the basis that the State was still considering requesting the death penalty or LWOP,

the trial court reset the hearing for two days later. As it happened, the State did not request the death penalty or LWOP in the next two days.

[7] On March 16, 2012, during Englert's plea hearing, he and the trial court had the following exchange:

> BY THE COURT: And do I understand that Mr. McCoy and Mr. Montgomery have been representing you throughout this matter?
>
> BY MR. ENGLERT: Yes, sir.
>
> BY THE COURT: And you are satisfied with their services?
>
> BY MR. ENGLERT: Yes, sir.

Trial Tr. p. 42. Englert also told the trial court that no one had made any promises or threats to induce his guilty plea. Englert pled guilty to the murder charge and explained that he had knowingly helped Williams murder Gibson. The trial court accepted Englert's plea and entered a judgment of conviction for murder. Englert waived sentencing within thirty days, and the sentencing hearing was later continued until the remaining charges had been tried.

[8] On August 3, 2012, McCoy and Montgomery moved to withdraw, which motion the trial court heard on August 17, 2012. McCoy told the trial court that Englert had accused McCoy of "lying to him, misleading him" and that "we may be headed to a motion to withdraw a plea" in which case McCoy would become a witness and could not represent Englert. Appellee's PCR App. Vol. II p. 6. Englert told the trial court, "I just feel like I am being not truthfully represented" and "I feel like they wouldn't help me as much as they can." Appellee's PCR App. Vol. II p. 6. The trial court denied counsel's motions on

August 23, 2012, noting that neither Englert nor his attorneys had provided sufficient grounds for changing Englert's representation, particularly because his counsel had represented Englert for thirteen months and trial on the remaining charges was scheduled to begin on November 18, 2012.

[9] On September 10, 2012, Englert sent the trial court a request to withdraw his guilty plea, alleging he was not of sound mind when he pled guilty. On September 27, 2012, the trial court struck the motion. On October 15, 2012, Englert moved for change of counsel on the basis that there had been a breakdown in the attorney/client relationship. The trial court heard this motion on October 19, 2012, and denied it.

[10] On October 27, 2012, Englert filed a complaint with the Indiana Supreme Court Disciplinary Commission about his attorneys, accusing them of lying to him about various things. On November 5, 2012, Englert wrote the trial court to say that he had filed the disciplinary complaint. Englert wrote that "I would also like to let you know that I know my lawyers are working for me and I appreciate the work they have done and are doing on my behalf," but that his counsel were "not truthful with me and have taken advantage of me." Appellee's PCR App. Vol. II p. 12. Englert complained that "it's ridiculous and unprofessional at how my lawyers are acting towards me." Appellee's PCR App. Vol. II p. 13. He concluded, "As you already know I have gone to some inmates for information and now I know it was not the right thing to do." Appellee's PCR App. Vol. II p. 13.

[11]     Englert's letter was filed on November 8, 2012, and discussed at a final pretrial hearing on November 9, 2012. McCoy renewed his motion to withdraw, saying that he believed Englert's allegations of lying or misleading conduct "are tied to him, to the best of my knowledge, entering a plea of guilty to the charge of murder." Trial Tr. p. 112. The trial court observed that Englert's letter sounded like "cold feet." Trial Tr. p. 113. The trial court discussed Englert's dissatisfaction with his counsel and guilty plea, as follows:

> Your attorneys have come before this Court on more than one occasion, they've requested funding, they've been running depositions of all the witnesses that they---that there could be. This is buyer's remorse Mr. Englert. Based upon the information provided to me. We're not going back in on the guilty plea. I've got a record. I've got a transcript of that record. And that's a pretty good record in terms of what you knew what you were and were not doing.

Trial Tr. p. 119.

[12]     Englert testified under oath as follows:

> Q:     First of all, State to the Court, in what manner have you, well, first of all State to the Court the allegations which you have raised in your comp---your disciplinary complaint against your attorneys?
>
> A:     The allegations I raised is that my attorneys have not been truthful with me.
>
> Q:     Is that all---is that what you said?
>
> A:     Yeah.
>
> Q:     Tell me how?
>
> A:     Uh, they've lied to me about evidence.
>
> Q:     Tell me how?

A:  Well, they came to me and told me that, uh, they have this certain evidence against me and I asked them, uh, I never seen it, and then they say well maybe you're reading it wrong. You don't know how to read it. So I asked them to bring it to me to read it to me and then they said something like, oh maybe, I think we just got it two weeks. They just kept saying different things.

Trial Tr. p. 121–22. The trial court denied Englert's request, saying he had offered only "general statements without specifics" that could not be addressed by his counsel or dealt with by the trial court. Trial Tr. p. 123. The trial court also noted that Englert had expressed satisfaction with his counsel at the guilty-plea hearing.

[13]  A jury heard the remaining charges against Englert on November 13–16, 2012. The jury found Englert guilty of Class A felony conspiracy to commit murder, Class B felony conspiracy to commit criminal confinement, Class D felony criminal confinement, Class C felony conspiracy to commit battery, Class A misdemeanor battery, and Class A misdemeanor possession of marijuana. On January 29, 2013, the trial court sentenced Englert. When the trial court asked Englert if he was satisfied with the assistance his trial counsel had given him, he replied, "Yes sir I am." Trial Tr. p. 828. The trial court sentenced Englert to an aggregate sentence of eighty years of incarceration.

[14]  On direct appeal, we affirmed Englert's convictions and sentence in an unpublished decision. *Englert*, No. 79A04-1302-CR-88 at *8. On April 6, 2018, Englert filed an amended PCR petition. Following an evidentiary hearing conducted on August 13, 2018, the post-conviction court denied Englert's PCR petition on November 30, 2018.

# Discussion and Decision

Our standard for reviewing the denial of a PCR petition is well-settled:

> In reviewing the judgment of a post-conviction court, appellate courts consider only the evidence and reasonable inferences supporting its judgment. The post-conviction court is the sole judge of the evidence and the credibility of the witnesses. To prevail on appeal from denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite to that reached by the post-conviction court. […] Only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, will its findings or conclusions be disturbed as being contrary to law.

*Hall v. State*, 849 N.E.2d 466, 468–69 (Ind. 2006) (internal citations and quotations omitted).

## I. Whether Englert's Guilty Plea Was Knowing, Intelligent, and Voluntary

Englert seems to argue that his guilty plea to murder was rendered involuntary by the alleged threat that the State would seek the death penalty or LWOP if he did not plead guilty.

> A plea of guilty is an admission or confession of guilt made in court before a judge. It is also a waiver of specific constitutional rights. Fundamental due process requires that a criminal charge be proven beyond a reasonable doubt, *In Re Winship*, (1970) 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368, and a defendant's waiver of this right must be knowing, intelligent and voluntary, and appear affirmatively on the record of the guilty plea proceedings. *Boykin v. Alabama*, (1969) 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274. In order to uphold a guilty plea as knowing and voluntary the record must provide a sufficient basis

for the conclusion that the defendant was meaningfully informed of the rights and law detailed in Ind. Code § 35-4.1-1-3 (Burns 1979); *Turman v. State*, (1979) 271 Ind. 332, 392 N.E.2d 483, at 487.

*Anderson v. State*, 465 N.E.2d 1101, 1102 (Ind. 1984). Moreover,

[a]t the moment the plea is entered, the State must possess the power to carry out any threat which was a factor in obtaining the plea agreement which was accepted. The lack of that real power is what makes the threat illusory and causes the representation to take on the characteristics of a trick.

*Daniels v. State*, 531 N.E.2d 1173, 1174 (Ind. 1988).

[17] The record, however, does not indicate that anybody ever threatened Englert that the State would definitely seek the death penalty or LWOP unless he pled guilty or that his counsel believed that such a threat had been made. Moreover, even if such a threat *had* been made, it would not have been idle. It seems clear that Englert was, in fact, eligible for the death penalty or LWOP on at least three grounds. First, Englert had also been charged with Class C felony battery and Class B felony criminal confinement of Gibson, and convictions for either or both charges would have qualified Englert for the death penalty or LWOP. Ind. Code § 35-50-2-9(b)(13)(A). Second, there was ample evidence that Englert and his accomplices tortured Gibson before killing him. Ind. Code § 35-50-2-9(b)(11). "[T]orture is the gratuitous infliction of substantial pain or suffering in excess of that associated with the commission of the charged crime." *Gauvin v. State*, 883 N.E.2d 99, 103 (Ind. 2008) (citation omitted). There was evidence that Englert and his accomplices beat and then hog-tied Gibson with a belt and dog collar before placing him in a running shower for

ten to fifteen minutes. After removing Gibson from the shower, Englert and his accomplices again used the belt as a leash around Gibson's neck while transporting him to the murder site. Englert has failed to establish that his guilty plea was rendered involuntary by an illusory threat to seek the death penalty or LWOP.

## II. Ineffective Assistance of Trial Counsel

[18] Englert contends that he received ineffective assistance of trial counsel. We review claims of ineffective assistance of counsel based upon the principles enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984):

> Under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a claim of ineffective assistance of counsel requires a showing that: (1) counsel's performance was deficient by falling below an objective standard of reasonableness based on prevailing professional norms; and (2) counsel's performance prejudiced the defendant so much that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687, 694, 104 S. Ct. 2052; *Lowery v. State*, 640 N.E.2d 1031, 1041 (Ind. 1994). […] Failure to satisfy either prong will cause the claim to fail. *Vermillion v. State*, 719 N.E.2d 1201, 1208 (Ind. 1999).

*French v. State*, 778 N.E.2d 816, 824 (Ind. 2002).

[19] Trial counsel's performance "is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Wilkes v. State*, 984 N.E.2d 1236, 1241 (Ind. 2013) (citation omitted). Englert must prove that his trial counsel's representation fell below the minimum range of competence for attorneys in criminal cases. *Strickland*, 466 U.S. at 688–89. Englert cannot prevail by showing only "isolated poor strategy, bad tactics, a mistake,

carelessness or inexperience." *Lambert v. State*, 743 N.E.2d 719, 741 (Ind. 2001), *reh'g. denied*. Rather, Englert must show that his counsel's entire defense was inadequate. *Id.* Further, "'[j]udicial scrutiny of counsel's performance must be highly deferential.'" *Hampton v. State*, 961 N.E.2d 480, 491 (Ind. 2012) (quoting *Strickland*, 466 U.S. at 689). Englert's counsel's decisions are assessed objectively, in view of what a reasonable, minimally-competent attorney could have chosen to do or not do in the circumstances; this inquiry should not involve hindsight or evaluate his counsel's subjective opinions or beliefs. *Harrington v. Richter*, 562 U.S. 86, 106–07 (2011).

[20] As for prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* at 104 (quoting *Strickland*, 466 U.S. at 687). Rather, Englert must show that, had his counsel performed competently, there is "'a reasonable probability that […] the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). Failure to demonstrate both deficient performance *and* prejudice is fatal to an ineffective-assistance claim. *State v. Greene*, 16 N.E.3d 416, 419 (Ind. 2014). Accordingly, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. *Carter v. State*, 929 N.E.2d 1276, 1280 (Ind. 2010). Englert's specific claims of ineffective assistance are that (A) McCoy was ineffective because he coerced him into pleading guilty by knowingly making false statements to him and (B) both counsel were ineffective for failing to move to withdraw his guilty plea pursuant to Indiana Code section 35-35-1-4(b).

## A. Allegedly False Statements

Although Englert claims that his trial counsel made many false statements to him, the only one he specifically identifies on appeal is the alleged statement McCoy made to him and his family that the State would certainly pursue the death penalty or LWOP unless he pled guilty to murder. Englert, however, points to nothing in the record that such a statement was ever made. On the other hand, the record *does* contain substantial evidence refuting Englert's claim.

For one thing, McCoy testified that no meeting between himself, Englert, and Englert's parents ever occurred. Moreover, McCoy testified that while he was concerned that the State would request the death penalty or LWOP, he also testified that the State was only "*considering* the death penalty and [LWOP.]" PCR Tr. p. 21 (emphasis added). McCoy also testified that he did not coerce Englert into pleading guilty and "[a]bsolutely" made no false statements of material fact to Englert at any time. PCR Tr. p. 32. The record supports the post-conviction court's finding that McCoy "did not make false statements of 'material fact' and did not coerce [Englert] into pleading guilty." Appellant's PCR App. Vol. II p. 36. Englert has failed to establish that McCoy's performance was deficient for making false statements to him.

## B. Motion to Withdraw Guilty Plea

Englert claims that his trial counsel were ineffective for failing to move to withdraw his guilty plea. Pursuant to Indiana Code section 35-35-1-4(b),

[a]fter entry of a plea of guilty, or guilty but mentally ill at the time of the crime, but before imposition of sentence, the court may allow the defendant by motion to withdraw his plea of guilty, or guilty but mentally ill at the time of the crime, for any fair and just reason unless the state has been substantially prejudiced by reliance upon the defendant's plea. [….] However, the court shall allow the defendant to withdraw his plea of guilty, or guilty but mentally ill at the time of the crime, whenever the defendant proves that withdrawal of the plea is necessary to correct a manifest injustice.

[24]   Englert's argument is based on his already-discussed claim that his guilty plea was rendered involuntary by the State's allegedly illusory threat to seek the death penalty or LWOP. As discussed, however, there is no indication that any such threat was ever made, and it would not have been illusory if it *had* been made. Englert has failed to establish that a fair and just reason to grant a motion to withdraw his guilty plea existed or that granting a motion to withdraw would have been necessary to correct a manifest injustice, fatally undercutting any claims of deficient performance or prejudice. Englert has failed to establish that he received ineffective assistance of trial counsel.

[25]   The judgment of the post-conviction court is affirmed.

Vaidik, C.J., and Riley, J., concur.