# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**STEPHEN T. OWENS**
Public Defender of Indiana

**KEVIN R. HEWLATE**
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| KEITH WOODSON, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1108-PC-768 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Grant W. Hawkins, Judge
The Honorable Christine R. Klineman, Master Commissioner
Cause No. 49G05-0307-PC-124220

**February 23. 2012**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

Keith Woodson appeals the denial of his petition for post-conviction relief ("PCR petition"), which challenged his convictions for murder and Class A misdemeanor carrying a handgun without a license. We affirm.

## Issue

The sole issue before us is whether Woodson received ineffective assistance of trial counsel.

## Facts

On May 7, 2002, Stephen Webber shot and killed Anthony Dawson, a/k/a "Frog," in Indianapolis. Tr. 2 p. 34.[1] Dawson was friends with Woodson. After police investigation of the incident, the prosecutor's office decided not to file homicide charges against Webber because he had acted in self-defense.

On July 7, 2003, Webber was standing outside a friend's house in Indianapolis when someone drove by in a green car. This person then began firing at Webber with a handgun, striking and killing him. Thirteen-year-old Patrick Owens had been standing outside near Webber when he was shot, and Owens later identified Woodson as the shooter from a police photo array prepared by Detective Charles Benner of the Indianapolis Police Department. Additionally, fifteen-year-old Mario Johnson ran outside when he heard shots being fired, and he also later identified Woodson as the

---

[1] There were two trials for Woodson and thus, two transcripts. We will refer to the transcript from the first trial as "Tr. 1" and the transcript from the second trial as "Tr. 2." Likewise, we will refer to the appendix from the direct appeal as "App. 1" and the appendix in this appeal as "App. 2."

2

shooter from a photo array. Two other people standing outside had been unable to see the face of the driver of the green car.

The State charged Woodson with murder, Class B felony possession of a firearm by a serious violent felon, and Class A misdemeanor carrying a handgun without a license. The State later dismissed the serious violent felon charge. Woodson's first jury trial was held on October 18-20, 2004, at which he was represented by private attorney Kimberly DeVane.

During Owens's direct testimony, he stated that he had never seen the driver of the green car before the shooting and did not know him. He further discussed that when he was first asked to review a photo array on July 16, 2003, he saw someone familiar in the array but was afraid to say something. On July 21, 2003, however, Detective Benner again contacted Owens, after having been contacted by Webber's mother, and showed Owens another array. This time, Owens identified Woodson as the shooter.

On cross-examination, DeVane questioned Owens extensively regarding precisely where he was standing when he saw the shooting. She also elicited testimony that Owens had, before he identified Woodson in the photo lineup, heard rumors around the neighborhood that "PG" had shot Webber; "PG" is Woodson's nickname. She also reviewed statements Owens had previously given in which he had said that he saw Woodson driving in the neighborhood after the shooting but before identifying him in the lineup, and that he had been told that Woodson was "PG." Additionally, it was revealed

3

that Owens had told Detective Benner after picking Woodson's picture out of the lineup, "They call him PG," although Owens claimed to not remember saying that. Tr. 1 p. 133.

During Mario Johnson's direct testimony, he discussed meeting with Detective Benner on July 25, 2003, and picking Woodson out of a photo lineup. Again, the meeting with Detective Benner had been initiated by Webber's mother. Like Owens, he claimed not to have known who Woodson was before the shooting occurred. He also stated that he had not looked at any pictures related to the shooting before picking Woodson out of the photo lineup.

On cross-examination, DeVane examined the details of Johnson's identification of Woodson as he drove away from the shooting. She also directed him to prior deposition testimony, and his statement to Detective Benner, in which he discussed having been asked by Webber's family to look at old yearbook photographs of "PG" and to attempt to identify him as the shooter from them, but he had been unable to do so; Johnson claimed not to remember this. As with Owens, DeVane directed Johnson to his telling Detective Benner that the person he identified from the lineup was "PG"; again as with Owens, Johnson claimed not to remember saying that. Johnson claimed on redirect examination that although he had heard the name "PG" mentioned in the neighborhood after the shooting, he had not known the face that went with that name until Detective Benner showed him the photo lineup.

In a further attempt to impeach Johnson's credibility, DeVane presented evidence that while he was waiting to have a pretrial deposition taken, he was overheard by the

4

court reporter and others saying something to the effect of, "If I'm going to have to sit here, I want my money." Id. at 430-31. This was inferred by DeVane to mean that Johnson expected to be paid for his testimony in this case. Johnson attempted in his trial testimony to explain his comment as referring to a $1000 Crime Stoppers reward that had been offered in association with Webber's shooting, but he also stated that he knew he would not be paid for his testimony because of his prior cooperation with Detective Benner.

As further evidence in Woodson's defense, DeVane presented the testimony of three witnesses, besides Woodson himself, who provided an alibi for him at the time of the shooting: his mother, girlfriend, and girlfriend's sister. On October 20, 2004, after the conclusion of evidence in the first trial, the jury was hung and a mistrial was declared. A retrial was scheduled for December 20, 2004.

On November 30, 2004, DeVane filed a continuance motion. Among other matters, DeVane asserted that she "intend[ed] to retain an eyewitness expert to testify in this case" and she needed "additional time to acquire the funds, retain an expert and have the expert review the case to issue an opinion." App. 1 p. 160. The trial court granted the continuance motion. On December 15, 2004, DeVane filed a motion to withdraw her representation, stating that Woodson and his family were unable to pay her as agreed, and in fact could not afford to procure a transcript from the first trial. The trial court granted this motion, found Woodson to be indigent, and appointed a public defender to represent

him. However, on April 12, 2005, private attorney Paul Harper filed an appearance on Woodson's behalf.

Woodson's second trial was conducted on July 11-12, 2005. Owens and Johnson both testified again regarding their identification of Woodson as the shooter. Harper cross-examined Owens and Johnson regarding their identifications. He asked Johnson about persons showing yearbook pictures to him in an attempt to identify "PG." He also questioned Owens regarding whether he had discussed the case with anyone before speaking to Detective Benner. However, there was no questioning of either Owens or Johnson regarding their having told Detective Benner that the person they identified as the shooter was known as "PG," nor was there any questioning specifically regarding rumors in the neighborhood that "PG" had been the shooter. Harper also did not present any evidence of Johnson's statement before his deposition regarding wanting money. He also did not question Owens regarding his having seen Woodson driving in the neighborhood after the shooting and having been pointed out to him as "PG" by another person. Harper did re-present Woodson's alibi defense, with Woodson's mother and his girlfriend's sister testifying. Harper did not attempt to hire an eyewitness identification expert to assist in the defense or testify on Woodson's behalf.

During the second trial, the State was able to present additional evidence that it did not at the first trial. Specifically, Shelby Stone, an acquaintance of Woodson's, testified that while being transported together from jail to court on one occasion, Woodson told him, "you know I'm on the murder for killing that mother f***er that killed Frog, which

6

is my little cousin. And then he said, you know we couldn't let that s\*\*\* ride." Tr. 2. p. 294. Stone took this to mean that "they" had murdered Webber as revenge for Dawson's killing. Id. at 295. Stone, who was facing a charge of Class A felony dealing in cocaine, was offered a plea deal to Class C felony possession of cocaine partially in exchange for his cooperation in Woodson's case.

The jury in the second trial found Woodson guilty as charged. After Woodson was sentenced to a sixty-year term, he filed a direct appeal challenging the length of his sentence, and this court affirmed. See Woodson v. State, No. 49A02-0509-CR-831 (Ind. Ct. App. July 16, 2006). No other issues were raised on direct appeal.

On February 5, 2007, Woodson filed a PCR petition, which was later amended by counsel. The petition alleged that Harper had provided Woodson with ineffective assistance of trial counsel because he did not adequately impeach the credibility of Owens and Johnson during the second trial, and because he did not attempt to present the testimony of an eyewitness identification expert. The petition further alleged the existence of newly discovered evidence, namely, that Owens now believed he could not identify Woodson as the person who shot Webber.

During the PCR hearing, Woodson presented the testimony of Dr. Solomon Fulero. Dr. Fulero is a psychology professor, licensed Ohio attorney, and expert on eyewitness identification who has testified in numerous criminal cases, and whom DeVane had considered hiring before the first trial, but had not because of cost considerations. Dr. Fulero was questioned at length regarding factors that could have

7

affected the reliability of Owens and Johnson's eyewitness identifications, after having reviewed their testimony and depositions and the testimony of Detective Benner. Dr. Fulero, however, testified that he never states an opinion as to the ultimate veracity of an eyewitness's testimony.

DeVane also testified at the PCR hearing. She stated that she believed it was important to present evidence of Johnson's comments before the deposition regarding wanting money. She also believed it was important to cross-examine Owens and Johnson regarding rumors they had heard in the neighborhood that "PG" had shot Webber and that they explicitly identified Woodson as "PG" to Detective Benner when they picked his photograph out of the lineups. She also stated that after the first trial, she had discussed with Woodson's family that if she conducted a second trial, "we absolutely have to have the eyewitness." PCR Tr. p. 86. Presumably, DeVane was referring to Dr. Fulero or a similar expert.

Harper testified at the PCR hearing that he was aware of DeVane's opinion that an eyewitness identification expert would be important in a retrial, but that he had not pursued hiring one because of cost and his belief that he could not seek public funds to pay for an expert. Also, Harper could not recall why he did not present evidence of Johnson's pre-deposition comments, why he did not question Owens and Johnson regarding their naming of "PG" as the person they identified in the photo lineups, or why he did not question Owens regarding purportedly having seen Woodson driving in the neighborhood after the shooting but before speaking to Detective Benner.

Finally, Owens testified at the PCR hearing that he, in fact, had not gotten a good look at Webber's killer and could not now positively say that Woodson was that person. Owens stated that he had felt pressured to make an identification by Detective Benner and Webber's mother, but could not precisely identify anything they said or did to pressure him to identify Woodson. He also noted that he himself had been accused of murder based on a photo identification and that "it's hurtful to see somebody that's doing time for stuff or, you know, for something that they might not have even did." Id. at 123.

On July 7, 2011, the post-conviction court entered its order denying Woodson's PCR petition, with accompanying findings and conclusions. The court did not find Owens's PCR testimony to be credible and, thus, rejected Woodson's claim of newly discovered evidence. It further stated that Harper's cross-examination of Owens and Johnson, while not identical to DeVane's cross-examination, was nonetheless "skillful, pertinent, and effective." PCR App. p. 176. Regarding an eyewitness identification expert, the post-conviction court found it doubtful either that public funds would have been allocated for such an expert or that testimony by such an expert would have been admissible at trial. Woodson now appeals.

**Analysis**

Post-conviction proceedings provide defendants the opportunity to raise issues not known or available at the time of the original trial or direct appeal. Stephenson v. State, 864 N.E.2d 1022, 1028 (Ind. 2007), cert. denied. "In post-conviction proceedings, the defendant bears the burden of proof by a preponderance of the evidence." Id. We review

9

factual findings of a post-conviction court under a "clearly erroneous" standard but do not defer to any legal conclusions. Id. We will not reweigh the evidence or judge the credibility of the witnesses and will examine only the probative evidence and reasonable inferences therefrom that support the decision of the post-conviction court. Id. Additionally, the PCR court here entered findings of fact and conclusions thereon, as required by Indiana Post-Conviction Rule 1(6). We cannot affirm the judgment on any legal basis, but rather, must determine if the court's findings are sufficient to support the judgment. Lile v. State, 671 N.E.2d 1190, 1192 (Ind. Ct. App. 1996).

On appeal, Woodson has abandoned his claim of newly discovered evidence and focuses solely upon Harper's alleged ineffectiveness during his second trial. To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his or her counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. Ben–Yisrayl v. State, 729 N.E.2d 102, 106 (Ind. 2000) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)), cert. denied. An attorney's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. French v. State, 778 N.E.2d 816, 824 (Ind. 2002). To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Failure to satisfy either prong will cause the claim to fail. Grinstead v. State,

845 N.E.2d 1027, 1031 (Ind. 2006).  Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone.  Id.

Woodson first contends that Harper was ineffective because he did not cross-examine Owens or Johnson regarding matters that could have impeached their credibility as eyewitnesses to Webber's murder, matters that DeVane had raised in the first trial. Specifically, Woodson contends Harper was ineffective for not exploring evidence that Owens and Johnson both identified Woodson as "PG" to Detective Benner, despite claims that they did not know who Woodson was, or that Johnson and Owens were aware of rumors in the neighborhood that "PG" had killed Webber.  He also challenges Harper's failure to present evidence of Johnson's pre-deposition comments regarding a desire to be paid, or of Owens's allegedly having seen Woodson driving in the neighborhood after the shooting and being identified as "PG" by another person. Woodson notes that Harper testified at the PCR hearing that he was aware of this evidence and thought he had presented it, and could not remember a specific strategic reason why he would not have presented it.

Regardless of Harper's inability to remember why he would not have presented this evidence, we judge his performance by the standard of objective reasonableness, not his subjective state of mind.  See Harrington v. Richter, -- U.S. --, 131 S. Ct. 770, 790 (2011).  Courts should not insist that attorneys "confirm every aspect of the strategic basis for his or her actions."  Id.  The Supreme Court also has recently emphasized that "Strickland does not guarantee perfect representation, only a 'reasonably competent

11

attorney.'" Id. at 791 (quoting Strickland, 466 U.S. at 687, 104 S. Ct. at 2064 (in turn quoting McMann v. Richardson, 397 U.S. 759, 770, 90 S. Ct. 1441, 1448 (1970))). Representation is constitutionally ineffective only if the proper functioning of the adversarial process was so undermined that the defendant was denied a fair trial. Id. There is no constitutional requirement that a defense attorney be a flawless strategist or tactician. Id. "Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective." Smith v. State, 765 N.E.2d 578, 585 (Ind. 2002).

An argument could be made that Harper's cross-examination of Owens and Johnson was not as thorough as DeVane's in the first trial. However, our job here is not to grade Harper's performance as compared to DeVane's. Nor is it relevant that Woodson's first trial ended in a mistrial while his second trial ended in his conviction. The State possessed crucial evidence in the second trial that it did not in the first: the "jailhouse snitch" testimony of Stone that implicated Woodson in Webber's murder. Additionally, juries are not interchangeable machines but instead are made up of twelve unique individuals, and there was nothing precluding the second jury from weighing the evidence differently than the first jury.

Harper did in fact question Owens and Johnson extensively on their identification of Woodson as Webber's killer. He asked about their delay in meeting with police to discuss the case and also about Owens's failure when he first met with Detective Benner to identify Woodson in the photo lineup. He examined their immediate reaction to the

12

shooting and their ability to see the person who shot Webber. He also questioned Johnson regarding having been shown photographs of possible suspects before meeting Detective Benner, and Owens having discussed the case with Webber's mother and sister before meeting Detective Benner.

Moreover, the evidence that Harper did not present on cross-examination of Owens and Johnson was not in the nature of clearly exculpatory evidence. It merely was evidence that might have impeached their credibility, and none of it cast definitive doubt on Owens's and Johnson's identifications of Woodson. Harper did in fact attempt to impeach their credibility. He just did not do so in a manner identical to DeVane. "[T]he method of impeaching witnesses is a tactical decision and a matter of trial strategy that does not amount to ineffective assistance." Kubsch v. State, 934 N.E.2d 1138, 1151 (Ind. 2010). The post-conviction court's conclusion that Harper's cross-examination of Owens and Johnson was adequate and constituted effective representation is not clearly erroneous. See id. (holding trial counsel was not ineffective for failing to present all possible impeachment evidence against a key State's witness).

Next, Woodson contends Harper was ineffective for failing to procure the services of an eyewitness identification expert to assist with and testify in his second trial. Although Woodson contends an expert on eyewitness identification would have been useful both in pretrial consultation with Harper and in trial testimony, Woodson focuses his ineffective assistance argument on the lack of trial testimony by an expert, and we will do likewise. Additionally, whatever advice an expert may have been able to give

13

Harper about questioning eyewitnesses would have been of little use if the expert was unable to testify and explain to the jury why such questions were important.

Harper's explanation for failing to pursue hiring an expert for Woodson's second trial was that because Woodson (or his family) had hired private counsel, they would be ineligible for public funds to hire an expert and they did not have the financial means to hire an expert on their own. As Woodson points out, Harper's belief on this point was inaccurate. It is possible that a defendant who has managed to retain private counsel still may be found indigent for the purposes of hiring an expert witness and entitled to public funds for that purpose. See Beauchamp v. State, 788 N.E.2d 881, 890 (Ind. Ct. App. 2003). After DeVane withdrew from representing Woodson following the first trial, the trial court found him indigent, though his family did later manage to hire Harper. Similar to Beauchamp, this may have been a situation in which Woodson could have been found indigent for the purpose of hiring an expert witness, despite having private counsel.

Nonetheless, even if Harper acted unreasonably or under a mistaken belief in failing to pursue hiring an expert witness on eyewitness identification, Woodson has not established that he was prejudiced by that failure. The key issue here is whether any such expert's testimony would have been admissible in Woodson's second trial. We conclude it is highly likely that such testimony would have been found inadmissible at the time of Woodson's second trial.

In 2004, this court decided Farris v. State, 818 N.E.2d 63 (Ind. Ct. App. 2004), trans. denied. In that case, we affirmed the trial court's exclusion of the defendant's

14

proffered expert witness testimony regarding eyewitness identification. The majority of the panel based its affirmance on two reasons. First, the proposed expert was prepared to testify as to the truth or veracity of the eyewitnesses in the case. This would have violated Indiana Evidence Rule 704(b), which precludes any witness from giving an opinion concerning whether another witness has testified truthfully. Farris, 818 N.E.2d at 67.

The majority also held that the proposed testimony would have been inadmissible under Indiana Evidence Rule 702(b), which permits expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Although eyewitness identification expert testimony may be admissible in some cases, its admissibility is "'fact sensitive and must be assessed on a case-by-case basis.'" Id. at 68 (quoting Cook v. State, 734 N.E.2d 563, 570 (Ind. 2000)). The majority held that the trial court did not abuse its discretion in excluding the expert testimony, because there were two eyewitnesses, not just one, their accounts were consistent with each other and a surveillance video, and the defendant had also presented an alibi defense. Id.

Judge Baker wrote a separate concurring opinion, agreeing solely that the proposed expert witness's testimony was inadmissible under Evidence Rule 704(b). Id. at 72-73 (Baker, J., concurring). Judge Baker noted research and articles on problems that have been discovered with eyewitness identification and stated, "In sum, the evidence provided by eyewitness identification experts can help the jury assess the

15

accuracy and credibility of eyewitnesses, and, as such, can be valuable in cases where the identity of the perpetrator is at issue." Id. at 73. It appears that Judge Baker did not agree with the majority's analysis regarding Evidence Rule 702(b). Nonetheless, his view did not carry the day.

Here, Dr. Fulero, the expert almost hired by DeVane for the first trial, testified at the PCR hearing that he never gives an opinion regarding the veracity of an eyewitness's testimony during trial. This would have rendered his testimony consistent with Evidence Rule 704(b). However, the majority view in Farris was that the expert's testimony also was inadmissible because it would not have been sufficiently helpful to the jury under Evidence Rule 702(b), given the existence of two eyewitnesses giving statements that were consistent with each other and the surveillance video, as well as the defendant's alibi claim. Here, there were not one but two eyewitnesses giving consistent statements about Woodson's identity, and Woodson also presented an alibi defense that presented a central issue that the jury had to consider aside from the eyewitness testimony. True, there was no corroborating surveillance video in this case. Regardless, the facts of Farris and Woodson's case are so similar that a trial court likely would have properly excluded any eyewitness identification testimony in Woodson's case on the basis of Farris.

Woodson spends much time and energy challenging the breadth of Farris's majority holding, directing us to Dr. Fulero's extensive PCR testimony on the subject of eyewitness identification and recent writings on that topic. See, e.g., State v. Henderson, 27 A.3d 872, 892-914 (N.J. 2011). We are, of course, very cognizant of the close

16

scrutiny eyewitness identification in criminal cases has received in recent years, and in particular since the time Farris was decided. See, e.g., Perry v. New Hampshire, -- U.S. --, -- S. Ct. --, No. 10-8974 (Jan. 11, 2012). The present case is not a proper vehicle for challenging the holding of the majority in Farris, or generally for litigating the propriety of eyewitness identification evidence. Such a case would be a direct appeal from a ruling regarding the admissibility of eyewitness expert testimony. "For purposes of ineffective assistance of counsel claims, the law requires consideration of legal precedent available to counsel at the time of his representation of the accused, and counsel will not be deemed ineffective for not anticipating or initiating changes in the law." Sweeney v. State, 886 N.E.2d 1, 8 (Ind. Ct. App. 2008), trans. denied. Farris undoubtedly was valid authority in 2005, at the time of Woodson's second trial, and in fact still has not been abrogated. The question is whether, in light of Farris, it constituted ineffective assistance for Harper not to pursue retaining the services of an eyewitness identification expert to challenge the credibility of the State's two key witnesses. We conclude it was not.

**Conclusion**

The post-conviction court was not clearly erroneous in finding that Harper's cross-examination of Owens and Johnson was not ineffective and that Harper was not ineffective for not attempting to procure the services of an eyewitness identification expert for Woodson's second trial. We affirm the denial of Woodson's PCR petition.

Affirmed.

KIRSCH, J., and BRADFORD, J., concur.

17