## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 13 2015, 8:25 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

| ATTORNEYS FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| --- | --- |
| Stephen T. Owens<br>Public Defender of Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| J. Michael Sauer<br>Deputy Public Defender<br>Indianapolis, Indiana | Ellen H. Meilaender<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
| --- | --- |
| Gene Hooks,<br><br>*Appellant-Petitioner,*<br><br>v.<br><br>State of Indiana,<br><br>*Appellee-Respondent.* | July 13, 2015<br><br>Court of Appeals Case No.<br>82A01-1412-PC-546<br><br>Appeal from the<br>Vanderburgh Superior Court<br><br>The Honorable Robert J. Pigman,<br>Judge<br><br>Cause No. 82D03-1108-PC-6 |

**Kirsch, Judge.**

[1]     The Vanderburgh Superior Court denied Gene Hooks's petition for post-conviction relief, and he now appeals claiming that the post-conviction court clearly erred in denying his petition. On appeal, he raises one issue that we restate as: whether trial counsel provided ineffective assistance for failing to

object during trial and during the State's closing argument and for presenting purportedly inconsistent defense theories during opening statement and closing argument.

[2]     We affirm.

## Facts and Procedural History

[3]     The facts underlying Hooks's convictions, as presented in his direct appeal, are:

> Hooks and his wife, Maxine, often babysat for their daughter Aleta's children, including I.W., who was born in December 2001, and C.H., who was born in May 1995. In July 2008, Aleta's fiancé, Maurice, walked into I.W.'s bedroom and saw her "humping" a pillow with her hand near her genital area. I.W. told Maurice that Hooks had "messed" with her. I.W. told Aleta that Hooks had put his "thing" or "private" on her "private." According to I.W., Hooks took her into the laundry room, had her stand on a stepping stool, removed her pants, placed cocoa butter on her genital area, and rubbed his penis on her genitals. After he stopped, he would give I.W. some toilet paper and tell her to wipe off the cocoa butter.
>
> Later, Maxine went to Maurice's residence to talk to Aleta and the girls. While Maxine was questioning C.H., C.H. said that Hooks had also touched her. According to C.H., Hooks started touching her when she was five years old. C.H. said that, when Hooks and Maxine lived in an apartment, he would put C.H. on his lap, pull her pants down, put cocoa butter on her, and rub his penis on her inner thigh. When Hooks and Maxine moved into a new house, he would put her on the step stool in the laundry room, put cocoa butter on her, and rub his penis against her vagina. Afterwards, Hooks would give her a paper towel, and she would clean the cocoa butter and "white goopey stuff" off of herself. Hooks stopped touching C.H. when she was eleven. When she was five years old, C.H. drew a picture of what was happening and gave it to Maxine, but Maxine told C.H. to stop lying.
>
> In 2001, Maxine and Hooks adopted twin sons belonging to Maxine's cousin, Helen. In 2006 through mid-2008, Maxine and Hooks also

took care of two more of Helen's children, including her daughter L.Y., who was born in June 1998, while Helen was incarcerated. After Helen learned of C.H. and I.W.'s allegations, L.Y. told Helen that Hooks had also touched her.

*Hooks v. State*, No. 82A01-1005-CR-220, slip op. at *1, 941 N.E.2d 567 (Ind. Ct. App. Jan. 26, 2011), *trans. denied* (citations omitted).

[4] The State charged Hooks with three counts of child molesting, one as a Class A felony, alleging sexual intercourse with L.Y., and two as Class C felonies, alleging fondling or touching of I.W. and C.H., respectively. The State later amended the charging information to allege two more Class A felony child molesting counts, for having engaged in sexual intercourse with I.W. and with C.H.

[5] A four-day jury trial was held in March and April 2010. Hooks was represented by attorney counsel Steven Bohleber both before and during trial. Bohleber conducted pretrial discovery, including written discovery and multiple depositions. At trial, the State presented the testimony of eight witnesses, and the defense called five witnesses, including Hooks. During trial, L.Y. became unresponsive to questions, having answered "only a fraction of the questions asked" and "most of her answers were barely audible or inaudible." *Id*. at *2. Consequently, Hooks moved to strike L.Y.'s testimony. Although the trial court denied the motion, it later terminated the direct examination and instructed the jury not to consider L.Y.'s testimony, finding that it was insufficiently probative and the jury could not consider it. The trial court then granted a directed verdict regarding Count I, Class A felony child molesting,

which had alleged that Hooks engaged in sexual intercourse with L.Y. At the close of the State's evidence, Hooks moved for and the trial court granted directed verdicts on the other two Class A felonies as well, based on lack of evidence as to intercourse with I.W. and C.H.

[6] The jury found Hooks guilty of the two remaining Class C felonies, and the trial court sentenced him to two consecutive six-year sentences. *Id.* On direct appeal, Hooks asserted that the trial court erred by not striking certain witness testimony and claimed that the evidence was insufficient to sustain his convictions. *Id.* at *2-4. This court affirmed his convictions. *Id.* at *4.

[7] On August 4, 2011, Hooks filed a *pro se* petition for post-conviction relief, and after the Public Defender of Indiana filed an appearance on his behalf, Hooks filed an amended petition, alleging that trial counsel: (1) failed to object to, or prevent the introduction of, evidence "that Hooks threatened to kill people, pulled guns on people, fired guns at persons and residences, possessed weapons, and had a violent character"; (2) made claims in opening statement that he knew or should have known would not be supported by trial evidence and, in closing argument, failed to advocate in line with Hooks's trial testimony; and (3) failed to object during the State's closing argument when the prosecutor mentioned matters not in evidence. *Appellant's App*. at 46.

[8] The post-conviction court held a two-day hearing. Bohleber testified at the hearing at length, and an expert who reviewed the trial record of proceedings also testified, opining that Bohleber performed ineffectively in Hooks's defense.

In December 2014, the post-conviction court entered written findings of fact and conclusions thereon denying post-conviction relief. Hooks now appeals.

## Discussion and Decision

[9] Post-conviction proceedings are not "super appeals" through which a convicted person can raise issues that he did not raise at trial or on direct appeal. *Timberlake v. State,* 753 N.E.2d 591, 597 (Ind. 2001), *cert. denied* 537 U.S. 839 (2002); *Hinesley v. State*, 999 N.E.2d 975, 981 (Ind. Ct. App. 2013) (quoting *Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013)), *trans. denied.* Instead, post-conviction proceedings afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Hinesley*, 999 N.E.2d at 981. Post-conviction proceedings are civil in nature, and petitioners bear the burden of proving their grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Garcia v. State*, 936 N.E.2d 361, 363 (Ind. Ct. App. 2010), *trans. denied.* A petitioner appealing from the denial of post-conviction relief stands in the position of one appealing from a negative judgment. *Id.* A petitioner who appeals the denial of post-conviction relief faces a rigorous standard of review, as the reviewing court may consider only the evidence and the reasonable inferences supporting the judgment of the post-conviction court. *McCullough v. State*, 973 N.E.2d 62, 74 (Ind. Ct. App. 2012) (citing *Shepherd v. State*, 924 N.E.2d 1274, 1280 (Ind. Ct. App. 2010), *trans. denied*), *trans. denied.* The defendant must establish that the evidence, as a whole, unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Hinesley*, 999 N.E.3d at 981; *Garcia*, 936 N.E.2d at

363. "'In other words, the defendant must convince this Court that there is *no* way within the law that the court below could have reached the decision it did.'" *Wilkes*, 984 N.E.2d at 1240 (quoting *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002), *cert. denied* 540 U.S. 830 (2003)) (emphasis in original).

[10] Hooks claims that the post-conviction court erred by concluding that he received effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that he was prejudiced thereby. *Wilkes*, 984 N.E.2d at 1240 (citing *Strickland v. Washington,* 466 U.S. 668 (1984)). This is the so-called *Strickland* test. This standard first asks whether, considering all the circumstances, counsel's actions were "reasonable[ ] under prevailing professional norms." *Id*. As our Supreme Court has explained,

> Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.

*Timberlake*, 753 N.E.2d at 603 (citations and quotations omitted).

[11] Even if counsel's performance is deficient, the defendant must demonstrate that counsel's performance actually prejudiced the defense. *Wilkes*, 984 N.E.2d at 1241. "'To establish the requisite prejudice, a petitioner must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different.'" *McCullough*, 973 N.E.2d at 74-75. Our Supreme Court has stated that a "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Smith v. State,* 765 N.E.2d 578, 585 (Ind. 2002). The two elements of *Strickland* are separate and independent inquiries. Failure to satisfy either prong will cause the claim to fail, but most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *McCullough*, 973 N.E.2d at 75.

### A. Evidence of Violence

[12] Hooks claims that his trial counsel rendered constitutionally ineffective assistance by allowing into evidence certain testimony that Hooks owned guns and knives and had used them in a way to indicate a violent character. More specifically, Hooks challenges trial counsel's failure to prevent the introduction of certain evidence, including the following: (1) I.W.'s testimony that Hooks told her that he "was going to kill [her] daddy" "because he didn't like him" (*Trial Tr*. at 59-60) ; (2) I.W.'s testimony that she observed Hooks and her father during an argument, and Hooks "got a gun" (*Id*. at 66); (3) Aleta's testimony that she had reason to be fearful of Hooks because he kept weapons in the house, she knew "what he was capable of," and that, when she was eighteen or nineteen years old, Hooks had "shot my house up, and tried to shoot my kids' dad, my oldest kids' dad" (*Id.* at 163-64); (4) Aleta's testimony that her daughter V.H., who was not a victim in this case, said that Hooks "pulled guns on her" (*Id*. at 167); (5) Aleta's testimony, in response to a juror question regarding whether Hooks kept any guns in a closet by the laundry room, that

Hooks kept a gun and a sword in a hall closet by the laundry room; (6) C.H.'s testimony that Hooks had a silver gun that "he pointed [] at me but I wasn't scared of it" (*Id.* at 205); (7) V.H.'s testimony that Hooks "put a gun to my head before and asked me if I was scared" . . . "just to spite me[,] but he doesn't scare me." (*Id.* at 231); (8) and Helen's testimony that when she and relatives went to Hooks's house to confront him after Helen's daughter L.Y. alleged that he had molested her, Hook "put a gun on us, and we all jumped back in the car and left." *Id.* at 252. Hooks maintains this "barrage of extrinsic evidence regarding his conduct and character" was irrelevant to the charged offenses and prejudiced him, claiming that it "stripped [him] of his presumption of innocence, predisposed the jury to find him guilty, and made a fair trial impossible." *Appellant's Br.* at 10-11; *see also id.* at 25.[1] We disagree.

[13] At the post-conviction hearing, Hooks's post-conviction counsel examined Bohleber about the various instances at trial when witnesses testified to Hooks keeping a gun or knife in the house and/or in a closet near the location of the molestations, or pointing a gun at people on specific occasions, or having made threats to kill Maurice because he did not like him. Post-conviction counsel inquired of Bohleber why he did not file a motion in limine to keep out such evidence, or object during trial on relevance grounds or some other grounds, including objecting to juror questions that eventually were posed asking if

---

[1] Hooks claims that trial counsel should have objected to the evidence "on the basis that it violated Ind. Evidence Rule 402, 404(a), and 404(b)," and the trial court "would have had no choice but to sustain the objections." *Appellant's Br.* at 18.

Hooks kept a gun in his house and if I.W. had ever seen him with a gun. Bohleber conceded that, in hindsight, the witnesses' testimonies in some instances may have been irrelevant. However, Bohleber explained, as he understood the State's strategy, the State intended to show that Hooks controlled the girls through use of, or possession of, the guns and knives, and thus such evidence was, or could have been considered, relevant from the State's perspective. Bohleber also testified that when evidence of Hooks's possession of or pointing of a gun initially came into evidence, he viewed it as "simply another of the spurious allegations" against Hooks, and did not view it as a major threat to the defense's case; Bohleber conceded, however, that as trial progressed, more evidence of such incidents was introduced and, in a sense, that angle "developed a life of its own," which he had not anticipated. *PCR Tr.* at 21.

[14] We have recognized, "[A]s a trial unfolds, events occur, some unexpected, that counsel must react to in real time. Thus, an appellate court cannot compare counsel's real-time performance to what might have been done with the benefit of hindsight." *McCullough*, 973 N.E.2d at 75. Even assuming, as Hooks claims, that Bohleber's performance was deficient and that he missed multiple opportunities to "stem the tide of extrinsic bad act and character evidence," *Appellant's Br.* at 15, Hooks must show that he was prejudiced by the challenged evidence, *i.e.*, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *McCullough*, 973 N.E.2d at 74-75. We find that Hooks has not met this burden.

When Hooks testified, he denied molesting I.W. and C.H., and he denied ever threatening his grandchildren with guns or knives. He also denied that he ever shot at Aleta's prior home, as she testified that he did. C.H., a victim in this case, testified that Hooks had previously pulled a gun on her but she "wasn't scared[.]" *Trial Tr.* at 205. Her sister, V.H., who was not a victim in this case, also testified that Hooks had put a gun to her head "to spite [her]" but reported, "[H]e doesn't scare me." *Id.* at 231. While I.W. testified that she had seen Hooks wield a gun during an argument with her father, Maurice, and observing that scared her, I.W. did not indicate that Hooks held a gun at her or put her in fear or threatened her not to tell. In fact, she testified that she did not disclose sooner because she was afraid her mother would be mad. Thus, the girls' testimonies did not indicate fear of Hooks because of the guns or knives kept in his home, nor did their testimony support the theory that he used those items to control them, as the State may have been trying to establish. In line with that, the State did not refer to any of that evidence in closing argument or make a propensity argument based on it.

This was a case of minor girls testifying to having been molested by Hooks, each giving descriptions of where and how it happened – including detail about step stools and cocoa butter and where other members of the household were at the time – and Hooks testifying that the molestations did not happen. The jury heard the evidence and, evidently, credited the children's testimony over Hooks's denial. Hooks has not established that but for trial counsel's alleged errors regarding the admission of evidence concerning guns or knives or violent

incidents, there is a reasonable probability that the result of the proceeding would have been different.

### B. Trial Counsel's Opening Statement and Closing Argument

[17]   Hooks also claims that Bohleber provided ineffective assistance by (1) making claims in opening statement that he knew or should have known would not be supported by the evidence, and (2) adopting a different defense theory in closing argument, which contradicted and undermined Hooks's testimony. We examine each argument in turn.

[18]   Bohleber explained at the post-conviction hearing that, initially, the defense strategy was to illustrate that there was family discord and that Aleta and Helen had coached their daughters to make the accusations against Hooks in order to harm him or gain advantage over him. In accordance with that strategy, Bohleber's opening statement told the jurors that Aleta and Helen had "long been at odds" with Hooks and his wife, and he advised the jury to "question the motives of the parents[.]" *Trial Tr.* at 10. Bohleber told the jury that such family discord was evident because – and they would hear evidence that – Aleta was "in a contentious civil litigation with them at the time these allegations were made." *Id.* Hooks points out that the trial evidence revealed that the lawsuit, which was a small claims suit for the return of Aleta's furniture, was filed *after* the allegations were made. This, Hooks argues, shows that Bohleber's opening statements were not supported by the trial evidence, which Hooks argues Bohleber knew or should have known, and that by making factual assertions that were not supported by the evidence, Bohleber diminished the

integrity of his defense. He claims that Bohleber "was not prepared for trial and did not adequately represent [him]." *Appellant's Br.* at 20.

[19] Hooks mounts a similar claim that Bohleber, in his opening statement, told the jury they would hear a witness testify to having heard Aleta and Helen stating that they were "going to get Gene Hooks" and were "going to put him in jail[,]" *Trial Tr.* at 11, thus supporting the idea that the parents schemed "to get" Hooks and the molestation accusations were simply falsehoods, made up to hurt Hooks. During trial, witness Thomas Payne testified to having heard Aleta and Helen "plotting against" Hooks and that Aleta stated she "was going to get that MF." *Id.* at 378-79. However, Payne's testimony revealed that he heard this conversation in or around May 2009, well after the allegations of abuse had been reported to the police in July or August 2008. Hooks argues that it may have appeared to the jury that Aleta's statement that she "was going to get" Hooks was motivated, not by family strife or vengeance, but instead on parental anger about the allegations that the children had disclosed. Thus, Hooks asserts, Payne's testimony may have worked against Hooks as opposed to in his favor. Hooks argues that Bohleber should have known that Payne's testimony would contradict his opening statement and potentially be harmful rather than helpful to his defense, and his representation was thus ineffective.

[20] We are not persuaded that Bohleber's opening statement about Aleta's lawsuit or Payne's anticipated testimony, even if they constituted deficient performance, ultimately prejudiced Hooks, given the other evidence presented and in view of the full record. In the opening statement, Bohleber suggested

that the family was at odds, resulting in false allegations being made against Hooks, and in support of that contentious relationship, Bohleber presented evidence during trial of Aleta's pending lawsuit against Maxine. He also called Payne as a witness to testify about statements he overheard Aleta make suggesting she was out to get Hooks. This tactic was consistent with Bohleber's opening statement. While Hooks points out that the trial testimony was not entirely consistent with what was forecasted in the opening statement – *i.e.*, the lawsuit was filed after and not before the allegations came to light, and, likewise, Aleta's statement as overheard by Payne was made after, not before the allegations by the children were made – we do not find that the alleged errors were sufficient to undermine confidence in the outcome of the proceedings.

[21] Hooks next claims that his trial counsel was ineffective because he adopted "a new defense theory" in closing that contradicted the opening statement as well as Hooks's testimony. *Appellant's Br*. at 19. Bohleber explained at the post-conviction hearing that, initially, the defense strategy illustrated that there was significant family discord and that Aleta and Helen had coached their daughters to make the accusations against Hooks in order to harm him or gain advantage over him. In accord with that plan, Bohleber intended to call a variety of family members as witnesses to illustrate the "war" between camps of the family. *PCR Tr*. at 80. However, after Hooks no longer faced three Class A felonies, the plan shifted away from calling a myriad of family members, which posed its own risks, to having Hooks testify to deny the girls' accusations.

During trial, Hooks testified that he believed Aleta and Helen had coached their daughters to falsely accuse him, which was consistent with the strategy suggested in Bohleber's opening statement. In closing argument, Bohleber argued that studies have shown that children can make up allegations of molestation for a variety of reasons, whether because someone suggested it to them, or peer pressure, or they simply do it on their own. Hooks argues that because trial counsel did not strictly stick with the original premise that it was the parents that were coaching the girls, trial counsel thereby "abandon[ed] this defense theory" and likewise abandoned his client. *Appellant's Br.* at 21. The post-conviction court determined, and we agree, that "the alleged change in theories of defense is not [] as pronounced . . . as advocated by the Petitioner." *Appellant's App.* at 115.

At the post-conviction hearing, Bohleber acknowledged that, after the defense obtained a directed verdict on the three Class A felonies, leaving the two Class C felonies pending, the defense strategy shifted somewhat, explaining that he no longer felt it was necessary to call the family witnesses, which could pose risks for Hooks, electing to change the defense strategy somewhat, focusing more on the children's accusations versus Hooks's personal denial. We recognize the defense theory expanded from the somewhat narrow position that it was entirely the parents' idea to make up these accusations, which was suggested in the opening statement, to the wider proposition that it is proven fact that children have been known to make up accusations of sexual abuse for a number of reasons, whether because someone told them to do so, or they

simply did it on their own accord. However, we are not persuaded that this change abandoned Hooks or contradicted his testimony. We "will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State,* 696 N.E.2d 40, 42 (Ind. 1998). As we have recognized, "[j]ust because trial counsel is unable to pursue a defensive strategy as effectively as he or she wanted to does not mean that the plan was a bad plan." *McCullough*, 973 N.E.2d at 76. "'*Strickland* does not guarantee perfect representation, only a reasonably competent attorney.'" *Woodson v. State,* 961 N.E.2d 1035, 1041-42 (Ind. Ct. App. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 110 (2011)), *trans. denied*. Here, our review of the record reveals that at the outset of trial, Bohleber presented a reasonable and sound defense strategy, and although he modified it based on events that occurred during trial, his performance during trial was aimed at executing the deliberate defense strategy and was not deficient or prejudicial to Hooks.

## C.  State's Closing Argument

[24]    Hooks also alleges that trial counsel was ineffective for failing to object during the State's closing argument. Specifically, he argues that, when the prosecutor commented that the victims' testimonies matched their prior statements to police, Bohleber should have objected because there had been no trial evidence concerning the substance of what the children had said during police interviews. That is, the statement by the prosecutor was impermissible commentary upon

matters not in evidence and, instead, reflected the prosecutor's personal knowledge of the case. The post-conviction court characterized the prosecutor's comment as "inappropriate," stating that it "should not have been presented to the jury" because, although it was established during trial that a complaint had been made and investigated by police and that the children had been interviewed, "the [] details of those statements had not been admitted for the jury's consideration[.]" *Appellant's App.* at 113. The post-conviction court concluded, however, that any error in failing to object represented an "isolated incident" and did not amount to either deficient performance or prejudice to Hooks. *Id.* at 115. Hooks claims that the post-conviction court was clearly erroneous in that regard, given that the State's case was based on the testimony of I.W. and C.H., and the prosecutor's comment "unfairly bolstered their credibility in the eyes of the jury." *Appellant's Br.* at 23.

[25] Initially, we note that Hooks claims that the post-conviction court applied an incorrect standard when it determined that Hooks did not suffer prejudice. The post-conviction court found that it was not likely that any objection, even followed with an admonishment, "would have led to a different result in the trial." *Appellant's App.* at 115 (Conclusion No. 9). Hooks argues that the correct standard is whether Hooks established by a preponderance of the evidence that there was a "reasonable probability" of a different result but for counsel's deficient conduct. *Appellant's Br.* at 23. We reject Hooks's claim that the trial court utilized an improper standard. The post-conviction court's order expressly recognized, and indeed defined, the "reasonable probability"

standard. *Appellant's App.* at 114. After reviewing the post-conviction court's order as a whole, we find that Hooks's reliance upon the singular phrase "would have led to a different result in the trial" does not consider the full context of the post-conviction court's decision, and we are satisfied that the post-conviction court applied the proper standard when reaching its decision.

[26] The State concedes that it was inappropriate for the prosecutor to have remarked that the children's trial testimony matched their statements to police because the substance of those statements was not in evidence. However, the State asserts, and we agree, "just because a matter is objectionable does not mean that it constitutes deficient performance not to object." *Appellee's Br.* at 21. Here, Bohleber testified at the post-conviction hearing that he rarely objects during a closing argument because (1) closing arguments of counsel are not evidence, which the jury is told, and the jury is equipped to "sort out the facts," and (2) in his opinion, objections at that stage are "rude and intrusive," and, further, objections during closing argument are often counterproductive and create a risk of alienating jurors. *PCR Tr.* at 77-79. He explained, in his experience and opinion, an objection may draw more attention to any certain comment by opposing counsel and, further, might appear to the jury as if counsel is trying to hide something.

[27] It is not our job to second-guess trial counsel's strategy and tactics, or suggest whether some other course would have been better. We are to determine whether the post-conviction court's determination as to ineffectiveness, which assessed whether the representation was deficient and/or prejudicial, was

clearly erroneous. Here, we find no error with the post-conviction court's determination that error, if any, for not objecting to the prosecutor's "inappropriate" commentary (regarding the girls' testimony as being consistent with their statements to police) was not prejudicial to Hooks. I.W. and C.H. gave consistent and detailed testimony about the acts perpetrated by Hooks against them. The jury was aware that the girls had spoken with police. We are not persuaded that the jury would not have believed their testimony but for the prosecutor's argument in closing that the girls' trial testimony was consistent with what they said during police interviews. Given the record before us, we find no reasonable probability that but for the alleged error, *i.e.*, not objecting, the result of the proceeding would have been different.

[28] The State maintains that counsel's performance, as a whole, was not deficient, particularly given that trial counsel succeeded in having three Class A felonies removed from the jury's consideration. While we agree that this was commendable, it was still appropriate that we examine the specific complaints raised by Hooks regarding trial counsel's performance. Having done so, we conclude that Hooks has failed to carry his burden to show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. Therefore, we affirm the post-conviction court's judgment.

[29] Affirmed.

Vaidik, C.J., and Bradford, J., concur.