## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 31 2017, 9:58 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Cynthia Maricle
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kenneth Frye,<br>*Appellant-Petitioner,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Respondent.* | May 31, 2017<br><br>Court of Appeals Case No.<br>89A05-1701-PC-18<br><br>Appeal from the Wayne Superior Court<br><br>The Honorable Gregory Horn, Judge<br><br>Trial Court Cause No.<br>89D02-1407-PC-13 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Petitioner, Kenneth Frye (Frye), appeals the post-conviction court's denial of his petition for post-conviction relief.

We affirm.

# ISSUE

Frye presents us with one issue on appeal, which we restate as: Whether Frye received ineffective assistance of trial counsel when counsel failed to tender a voluntary manslaughter instruction.

# FACTS AND PROCEDURAL HISTORY

A detailed recitation of the facts in this case were set forth in our memorandum opinion on direct appeal as follows:

> Frye supported himself by doing odd jobs, and spent most of his evenings drinking at the Knuckleheads Bar in Richmond. Frye admitted that he usually carried a .25 caliber handgun with him when he went out at night. Frye would socially drink with three of his friends, and the group would take turns buying pitchers of beer. Sometimes [Percy Campbell (Campbell)] joined the group; however, Campbell was always short on money and wanted to drink with them without paying.
>
> One night in early October 2011, Campbell, who was wearing a uniform shirt from a new job, approached Frye and his friends, and asked if he could have a drink with them. Despite Campbell's new job, he needed someone to loan him money for drinks because he had yet to be paid, but he promised to pay them back when he received his first paycheck. Frye agreed to

loan Campbell money for drinks and bought four pitchers of beer for $20.

Three or four weeks later, on October 31, 2011, Frye saw Campbell again. On that night, Frye was drinking alone at Knuckleheads and probably drank about 4 pitchers of beer. Frye asked Campbell about the debt, and Campbell agreed to repay Frye later that night at Alley Kats, a nearby bar.

Frye went to Alley Kats around 1:00 a.m. to collect his debt. According to Frye, when he approached Campbell about the debt, Campbell was dismissive. Frye described Campbell as "showin' off for his people" at Alley Kats and "actin' like he didn't know me now." Frye walked away from Campbell, but then returned a few minutes later, determined to be repaid. Witnesses, however, described Frye as the aggressor and claimed that Frye repeatedly punched Campbell in the face until Campbell grabbed him and held him in a headlock.

The confrontation ended when the bar owner and another employee told Frye to leave the bar and escorted him outside. Campbell was allowed to remain in the bar because the owner believed that Frye was the aggressor. A few minutes later, Frye walked back in the bar, raised his gun, and shot at Campbell. Frye claims that the first shot was fired at Campbell's knees, but no witness account or physical evidence supports that assertion. Frye continued walking toward Campbell and fired a second shot that struck Campbell in the eye. Campbell died almost instantly from a brain injury. Frye immediately ran from the bar.

*Frye v. State*, No. 89A05-1211-CR-577, 2013 WL 4022448 (Ind. Ct. App., Aug. 13, 2013) (internal references omitted).

On November 3, 2011, the State filed an Information, charging Frye with murder. A jury trial commenced on September 24, 2012, and the jury returned a guilty verdict on September 27, 2012. During the sentencing hearing on October 18, 2012, the trial court imposed an executed sentence of fifty-five years. On direct appeal, Frye argued that his sentence was inappropriate pursuant to Appellate Rule 7(B). Upon review, we affirmed the trial court.

On July 3, 2014, Frye filed a petition for post-conviction relief, which was amended by counsel on July 1, 2016. The post-conviction court conducted a hearing on Frye's petition on October 13, 2016. On December 15, 2016, the post-conviction court issued its findings of fact, conclusions thereon, and judgment, denying Frye's petition for post-conviction relief, in pertinent part, as follows:

> 12. At trial, Frye testified that Campbell was 'beatin' around the bush' about paying him back the money and he felt that Campbell was making fun of him which made him frustrated.
>
> 13. However, Frye was directly asked whether or not he was starting to get angry at this time, to which Frye replied, 'Nah, it was just like just, you know, either you are or you ain't …. It was just either you, either you're going to pay or you're not going to pay.'
>
> 14. When asked whether he was angry or mad after the first altercation at Alley Kats had occurred and he was being escorted outside, Frye simply states, 'No.' Frye later clarified that he was 'upset' but again, state[d] that he was not mad or angry.

15. After testifying regarding the initial incident inside the bar and being escorted outside, Frye was asked: 'How long were you outside before you went back in?' To which, Frye answered, 'Probably wasn't about two (2) minutes ... I don't know it might have been like, yeah, yeah, it was like two (2) minutes.'

16. Frye then stated that he went back inside, **not** to go back after Campbell but '... to see actually why was throwed out ...' He reiterated this, again, later in his testimony.

17. Frye claimed throughout the trial that the shooting was 'an accident.' Frye originally testified that he was shooting at Campbell's kneecap but later in his testimony stated that he was 'shooting at, I was shootin' at the ground, man.'

18. Frye even went so far as to testify that he was shooting downward but that the bullet kept curving up until it hit Campbell in the eye.

19. Frye was asked, yet again, on cross-examination if he was mad at this time. This time, Frye said, 'I was, uh, basically wasn't thinkin' man, I was drunk, uh, tipsy, uh, dizzy, you know, confused ... I was upset.'

* * * *

30. Frye's own testimony at trial was that the killing of Campbell was 'accidental and reckless;' that he meant to shoot Campbell in the leg and not the head. Such evidence is consistent with the trial strategy of attempting to show that the act was reckless and not an intentional killing.

31. The [c]ourt finds no evidence to support Frye's assertion or any conclusion that Frye acted under 'sudden heat' resulting from any conduct by Campbell.

32. Neither Frye's testimony nor any other witness testimony established that Campbell took any action of any kind or character which prompted sudden rage, anger, resentment, or terror which would have prevented Frye from 'cooling down' prior to shooting and killing Campbell.

33. The [c]ourt further finds that to the extent that Frye did experience any sudden rage, anger, resentment, or terror, such feeling or emotion had dissipated sufficiently in the two (2) minutes that Frye remained outside after being escorted out of the bar, which amount of time allowed Frye to regain his composure, deliberation, and to think rationally about his actions.

34. Frye's decision to, thereafter, reenter the bar, aim the gun, and to pull the trigger thereby having the bullet strike Campbell in the head causing him to die was an intentional act consistent with the verdict of the jury.

35. There was no basis in fact or law to pursue a claim of 'sudden heat' and a requested instruction on 'sudden heat' was not warranted.

(Appellant's App. Vol. II, pp. 55-56; 57-59).

Frye now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[8] We observe that post-conviction proceedings do not grant a petitioner a super-appeal but are limited to those issues available under the Indiana Post-Conviction Rules. Ind. Post-Conviction Rule 1(1). Post-conviction proceedings are civil in nature, and petitioners bear the burden of proving their grounds for relief by a preponderance of the evidence. P-C.R. 1(5). A petitioner who appeals the denial of post conviction faces a rigorous standard of review, as the reviewing court may consider only the evidence and the reasonable inferences supporting the judgment of the post-conviction court. *McCullough v. State*, 973 N.E.2d 62, 74 (Ind. Ct. App. 2012), *trans. denied*. The appellate court must accept the post-conviction court's findings of fact and may reverse only if the findings are clearly erroneous. *Id*. If a post-conviction relief petitioner was denied relief, he or she must show that the evidence as a whole leads unerringly and unmistakably to an opposite conclusion than that reached by the post-conviction court. *Id*.

## II. *Ineffective Assistance of Trial Counsel*

[9] Frye contends that the post-conviction court erred in finding that he was not denied the effective assistance of trial counsel. The Sixth Amendment to the United States Constitution protects the right to counsel and the right to effective assistance of counsel. When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1073 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and

convincing evidence to overcome this presumption." *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). Isolated poor strategy, inexperience, or bad tactics do not necessarily constitute ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (*citing Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)), *cert. denied*, 729 N.E.2d 102 (2001). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002). To establish prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001). Failure to satisfy either prong will cause the claim to fail, but most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *French*, 778 N.E.2d at 824.

[10] Frye alleges that his trial counsel committed ineffective assistance when he failed to tender an instruction on voluntary manslaughter. Frye was charged with and convicted of murder. To obtain a conviction for murder, the State was required to prove beyond a reasonable doubt that Frye knowingly or voluntarily killed another human being. Ind. Code § 35-42-1-1. The only difference between murder and voluntary manslaughter is the existence of

sudden heat, which for purposes of voluntary manslaughter is manifested by emotions such as anger, rage, sudden resentment, or terror sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection. *Evans v. State*, 727 N.E.2d 1072, 1077 (Ind. 2000). Voluntary manslaughter is defined in Indiana Code section 35-42-1-3, which provides in relevant part, "A person who knowingly or intentionally kills another human being . . . while acting under sudden fear commits voluntary manslaughter, a Level 2 felony." "The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder . . . to voluntary manslaughter." I.C. § 35-42-1-3. An instruction on voluntary manslaughter becomes warranted when the evidence demonstrates a serious evidentiary dispute regarding the mitigating factor of sudden heat; that is, there must be evidence showing sufficient provocation to induce passion that renders a reasonable person incapable of cool reflection. *Massey v. State*, 955 N.E.2d 247, 256 (Ind. Ct. App. 2011). However, words alone do not constitute sufficient provocation, especially words that are not intentionally designed to provoke. *Suprenant v. State*, 925 N.E.2d 1280, 1283 (Ind. Ct. App. 2010), *trans. denied*.

[11] There is no such evidence of sudden heat here. During his trial, Frye testified that when the argument at Alley Kats became heated upon Campbell's repeated refusal to repay Frye, Frye implored Campbell to "just pay [him] [his] money and [he'll] leave." (Tr. p. 583). As the fight ensued and Campbell held Frye in a headlock, the confrontation was broken up by employees and Frye was

thrown out of Alley Kats.  He affirmed that he was not angry when he was reaching for his gun as he was being escorted out of the bar.  Frye claimed that he was surprised to find himself outside and explained that he "felt upset and humiliated.  Drunk and dizzy, confused."  (Tr. p. 590).  After being outside for approximately two minutes, Frye entered Alley Kats again and shot Campbell.  During closing argument, Frye's counsel advocated that "[t]he whole issue in this case is knowingly or intentional versus reckless.  I'd submit to you, Ladies and Gentlemen, that [Frye's] state of mind was reckless."  (Tr. p. 689).

[12]     Our review of the transcript does not reveal any appreciable evidence of sudden heat.  Although there is testimony about hurt feelings and being upset, at no moment did Frye ever articulate that he developed an "impetus to kill" which "suddenly overwhelmed" him.  *See Stevens v. State*, 691 N.E.2d 412, 427 (Ind. 1997), *reh'g denied, cert. denied*, 525 U.S. 1021 (1998).  Moreover, the trial record indicates, as pointed out by the post-conviction court, that Frye's trial counsel pursued a theory of reckless homicide to persuade the jury that Campbell's killing was accidental.  As such, counsel's decision not to offer an instruction on voluntary manslaughter amounted to a strategic decision.  "There is no constitutional requirement that a defense attorney be a flawless strategist of tactician;" rather "[c]ounsel is afforded considerable discretion in choosing strategy and tactics and we will accord that decision deference."  *Woodson v. State*, 961 N.E.2d 1035, 1041-42 (Ind. Ct. App. 2012), *trans. denied*; *Randolph v. State*, 802 N.E.2d 1008, 1013 (Ind. Ct. App. 2004), *trans. denied*.  We "will not lightly speculate as to what may or may not have been an advantageous trial

strategy as counsel should be given deference in choosing a trial strategy which, at the time and circumstances, seems best." *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998). Given the evidence in the record, which supported an inference that Campbell's death was accidental as Frye only intended to shoot him "in the leg or something,'" we find that counsel's pursuit of a recklessness defense was a reasonable strategy. (Tr. p. 592). Because we conclude that there was no serious evidentiary dispute that Frye acted under sudden heat, he was not entitled to an instruction on voluntary manslaughter. Accordingly, Frye's counsel's trial performance did not fall below an objective standard of reasonableness and was not deficient. *See French*, 778 N.E.2d at 824.

# CONCLUSION

Based on the foregoing, we hold that Frye did not receive ineffective assistance of trial counsel.

Affirmed.

Najam, J. and Bradford, J. concur